UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Madeline Pavek, Ethan Sykes, DSCC, and DCCC, | Civil No. 19-CV-3000 (SRN/DTS) |
| Plaintiffs, | |
| vs. | **REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| Steve Simon, in his official capacity as the Minnesota Secretary of State, | |
| Defendant. | |

Plaintiffs rely on (1) factual assertions that find no support either in the complaint or in the actual electoral process that Minnesota will conduct in 2020 and (2) legal theories that lack any support in relevant case law. Because Plaintiffs fail to rebut the arguments provided by the Secretary of State, their complaint should be dismissed.

### ARGUMENT

**I.  PLAINTIFFS RELY ON "ASSUMED" FACTS THAT ARE NOT ALLEGED IN THE COMPLAINT.**

The purpose of a motion to dismiss under Rule 12 is to test the sufficiency of the facts alleged and legal theories propounded in the complaint. The court must grant a motion to dismiss when the complaint does not allege enough facts to state a claim to relief that is plausible, rather than merely conceivable, on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Notably, a plaintiff cannot avoid dismissal by inventing new factual theories and suppositions not alleged in the complaint and filing them in subsequent legal memoranda. *See id.* (conditioning dismissal on facts alleged in complaint); *Martin v. ReliaStar Life Ins. Co.*, 710 F.Supp.2d 875, 887 (D. Minn. 2010)

(holding that "allegations made in subsequent legal memoranda cannot correct inadequacies within a complaint" and that "[t]o hold otherwise would mean that a party could unilaterally amend a complaint at will, even without filing an amendment, and simply by raising a point in a brief").

      **A.    Plaintiffs' New Factual Assertions and "Assumptions" are Unsupported By, and Contrary To, The Allegations in Their Complaint.**

Plaintiffs attempt to use their responsive memorandum on this motion to reconfigure their entire lawsuit. In their complaint, Plaintiffs allege that their constitutional rights will be infringed because Minn. Stat. § 204D.13, subd. 2, will award first ballot position in November 2020 and the "primacy effect" advantage that comes from that specific position to the Legal Marijuana Now party. (*See, e.g.*, Compl. ¶¶ 3-4, 27 (alleging that challenged statute "mandates that the advantages of the primacy effect be conferred entirely upon the candidates of a single political party" and "requires that, in the upcoming November 2020 general election, all candidates who affiliate with the Legal Marijuana Now Party will be listed first in every partisan race, up and down the ticket").) In their responsive memorandum, however, Plaintiffs claim that it is the Republican Party that will overwhelmingly enjoy first ballot position and the "primacy effect." This directly contradicts the allegations in the complaint. (*See id.*)

Plaintiffs claim that the Republican Party will be the true beneficiary of the "primacy effect" because of the Legal Marijuana Now and Grassroots-Legalize Cannabis are actually non-entities whose participation in the 2020 election the Court can disregard. Once again, the Complaint alleges exactly the opposite. (*Id.* ¶ 4.) Plaintiffs admit that

they are "assum[ing]" that the Republican Party, rather than the Legal Marijuana Now or Grassroots-Legalize Cannabis party, will receive the benefit of the "primacy effect" in the upcoming general election. (Pls.' Resp. Mem. 2.) But Rule 12 does not permit a plaintiff to rescue a complaint by "assuming" facts not alleged in the pleading. *See Twombly*, 550 U.S. at 555 (mandating dismissal when plaintiff fails to "raise a right to relief above the speculative level"); *Carlson v. Ritchie*, 960 F. Supp. 2d 943, 953 (D. Minn. 2013) (dismissing constitutional claim on grounds that plaintiff's "assumptions about [his political opponents] are both speculative and conclusory" and thus failed to meet *Twombly* standard). Plaintiffs' attempts to avoid dismissal by reconfiguring the factual theory of their case should be rejected.

    **B.    Plaintiffs' New Factual Theory Is Belied By Minnesota's Actual Electoral Process.**

Plaintiffs attempt to support their admitted assumptions by making new factual allegations about the Legal Marijuana Now and Grassroots-Legalize Cannabis parties. Specifically, they contend that Minnesota's two newest major political parties have historically run few candidates for political office and that the Court should therefore generally disregard the parties' existence when analyzing the legal issues in this case.

As an initial matter, it is important to note that this factual question—that is, whether the role of the Legal Marijuana Now and Grassroots-Legalize Cannabis parties in the 2020 general election should be taken seriously, or else ignored—is likely to have significant consequences at many levels of the legal analysis in this case. For example, as explained below, a crucial element of the *Anderson/Burdick* level-of-scrutiny test

Plaintiffs rely on is the "character and magnitude" of the alleged burden that the challenged statute places on Plaintiffs' constitutional rights. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). That character and magnitude is necessarily much different in an election in which Republican and Democratic candidates are listed third and fourth on the ballot, respectively, than in one in which they are listed first and second. Along similar lines, the case law Plaintiffs rely on that invalidates "incumbent first" ballot provisions continually examines election policies that award the first ballot position, not the third, to a candidate who poses an obvious electoral threat to the plaintiff. *See, e.g., Graves v. McElderry*, 946 F. Supp. 1569, 1582 (W.D. Okla. 1996) (striking down Oklahoma statute granting first ballot position to all Democratic candidates, in suit brought by Republican candidates). In a lawsuit brought by Democratic Party entities, a ballot listing the Legal Marijuana Now and Grassroots-Legalize Cannabis candidates first and second self-evidently presents an entirely different set of facts.

For these reasons, the fact that (as Plaintiffs repeatedly allege in their complaint) it is the Legal Marijuana Now and Grassroots-Legalize Cannabis parties that will occupy the top two places on Minnesota election ballots in 2020 is vital to the analysis of Plaintiffs' constitutional claims.

> **1. The two new major parties are all but certain to run far more candidates for office in 2020 than they did in previous cycles.**

The central basis for Plaintiffs' admitted assumption that the existence of the Legal Marijuana Now and Grassroots-Legalize Cannabis parties can be disregarded in

this case is Plaintiffs' observation that a relatively small number of candidates belonging to these parties ran for office in Minnesota in 2018. (Pls.' Resp. Mem. 11.)

As noted above, this observation does not appear in the Complaint; in fact, it is directly contradicted there. (*See* Compl. ¶¶ 4, 27.) But even if that were not the case, Plaintiffs' analysis ignores crucial facts about the new legal status that the two small political parties now enjoy and the implications of that status for the 2020 election. In short, because it is much easier for major parties to place candidates on Minnesota's general election ballot than it is for minor parties, it is all but inevitable that the Legal Marijuana Now and Grassroots-Legalize Cannabis parties will run a far greater number of candidates for state office in 2020 than those parties ever have before. Moreover, it is impossible for either Plaintiffs or the Court to determine that any particular partisan race on the November 2020 ballot will not include a candidate from either of the new major parties.[1] Plaintiffs' attempt to exclude consideration of the new parties' role in the election therefore fails.

---

[1] This is especially important in light of the limited standing Plaintiffs have to allege that their own constitutional rights have been violated. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). To state a claim based on their new theory that a *Republican* candidate will benefit from the "primacy effect" and thus violate Plaintiffs' own rights, Plaintiffs would need to allege as a fact that a Republican candidate will be listed first on the ballot in the 2020 general election for one of fourteen specific offices: President, U.S. Senator, one of eight U.S. House seats, or one of the four state legislative seats whose districts the individual plaintiffs live in. Plaintiffs make no such allegations in the complaint—nor, for the reasons discussed in this section, could they do so.

Minnesota law requires each minor-party or independent candidate for Congress or state office to submit both an affidavit of candidacy and a nominating petition in order to appear on state election ballots. Minn. Stat. §§ 204B.03, .06, .07, .11. An affidavit of candidacy is a relatively simple filing that states a candidate's intention to run for office and includes additional information regarding the candidate's eligibility. *Id.* § 204B.06. A nominating petition requires substantially more work on a candidate's or party's part: depending upon the political office at issue, the petition must carry hundreds or thousands of signatures of eligible Minnesota voters who support the candidacy. *Id.* § 204B.11, subd. 2.[2] Similarly, minor-party and independent candidates for President of the United States who seek a place on the Minnesota ballot must submit a nominating petition bearing the signatures of 2,000 eligible Minnesota voters. *Id.*, subd. 2(a).

Major-party candidates for state and federal office, meanwhile, face much lower hurdles. A self-declared major-party candidate for U.S. Senator, U.S. Representative, statewide office, or state legislature need only file an affidavit of candidacy; he or she need never collect signatures on a petition. *See id.* §§ 204B.03, .06. The process is even easier for presidential candidates, once they have received the nomination of a major party: neither an affidavit of candidacy nor a nominating petition is required. *Id.* § 204B.06, subd. 4. Instead, the chair of each major party need only send the

---

[2] In an election for state legislative office, the petition must carry 500 signatures; for U.S. Representative, it must carry 1,000 signatures; and for U.S. Senator or a statewide office, it must carry 2,000 signatures. Minn. Stat. § 204B.11, subd. 2. State law also requires the candidate to pay a filing fee of $100 to $400, or else include language on the nominating petition indicating that the petition is being filed in place of the fee. *Id.*, subds. 1(a), 2.

Secretary written certification of the names of the party's nominee for President, along with the names of the party's nominees for Vice President, presidential electors, and alternate electors. *Id.* § 208.03.

These facts remove any basis for Plaintiffs' assumption that the Legal Marijuana Now and Grassroots-Legalize Cannabis parties will not meaningfully participate in Minnesota's 2020 general election. The fact that, in 2018, only a small number of candidates from these parties assembled the hundreds or thousands of petition signatures required to place their names on election ballots demonstrates nothing about party members' current ability to clear the far lower hurdles that state law presents to major-party candidates. This is, indeed, the central purpose of acquiring major-party status: it grants ballot access to the party's candidates without requiring them to undergo the considerable expense of gathering hundreds or thousands of petition signatures.

In 2020, for the first time, candidates from the Legal Marijuana Now and Grassroots-Legalize Cannabis parties will be able to run for state and Congressional offices without submitting anything more than a simple affidavit describing their intention and eligibility to run. It is thus an effective certainty that those parties will appear on Minnesota election ballots more frequently than they have in previous cycles. Plaintiffs' admitted assumption to the contrary is belied by state law and should be rejected.

In fact, though the 2020 election year is only a few weeks old, the Legal Marijuana Now party has already capitalized on its newfound major-party status to place one of its candidates on a ballot that minor parties cannot access. In the special primary

election conducted on January 21 in State Representative District 60A, the primary ballot included eleven DFL candidates—and one Legal Marijuana Now candidate. (*See* Primary Election Results web page, *https://electionresults.sos.state.mn.us/Results/-StateRepresentative/129*.)[3]

## 2. Plaintiffs' assertion that the incumbent will be listed first on the 2020 general election ballot for President is almost certainly false.

Finally, Plaintiffs assert that Donald Trump will be the first candidate listed on Minnesota's 2020 general election ballot for President. (Pls.' Resp. Mem. 3, 11.) This assumption is contrary to Minnesota law and disregards the existence of the two new major parties in the state.

As noted above, while a minor-party candidate for U.S. President must submit a nominating petition carrying the signatures of 2,000 eligible Minnesota voters to appear on the election ballot, the nominee of a major party need only secure a single letter from the party's chair to the Secretary certifying the candidate as the party's nominee. Minn. Stat. §§ 204B.11, subd. 2(a), 208.03. Next, the ballot order for major-party candidates for President is determined by Minn. Stat. § 204D.13. Thus, if either the Legal Marijuana

---

[3] Moreover, the *results* of the January 21 special primary undercut Plaintiffs' claims. Though candidates from the Legal Marijuana Now party enjoy automatic first-on-the-ballot status in 2020 primary elections, as well as general ones, based on the statute Plaintiffs here challenge (*see* Minn. Stat. §§ 204D.08, subd. 5, 204D.13, subd. 2), there appears to have been no "primacy effect" at work in District 60A: despite being listed first on the ballot, the Legal Marijuana Now candidate received fewer votes than each of the eleven DFL candidates. (See Primary Election Results web page, *https://electionresults.sos.state.mn.us/Results/StateRepresentative/129*.) A supposed electoral advantage that does not even enable a candidate to climb out of twelfth and last place has dubious value, if it even exists at all.

Now party or the Grassroots-Legalize Cannabis party merely submits a timely letter to the Secretary certifying the name of that party's nominee for U.S. President, that nominee—or the nominees of both new major parties—will be listed above the Republican nominee's name on the 2020 general-election ballot.

Moreover, it would be especially surprising if at least one of the two new major parties did not nominate a candidate for President in 2020, because the party did so four years earlier. In 2016, the then-minor Legal Marijuana Now party nominated Dan R. Vacek and Mark Elworth, Jr., as its candidates for President and Vice President, respectively. (*See* 2016 General Election Results web page, *https://www.sos.state.mn.us/elections-voting/2016-general-election-results/*.) Placing these candidates on the 2016 ballot required the party to secure 2,000 signatures of eligible Minnesota voters on the candidates' nominating petition. *See* Minn. Stat. § 204B.11, subd. 2(a). Now that it is classified as a major political party and enjoys the ballot access that comes with that classification, the Legal Marijuana Now Party will all but certainly nominate a candidate for President this year. That candidate will be listed above the Republican (and very possibly the Grassroots-Legalize Marijuana) nominee on the 2020 general election ballot.

For the above reasons, the new factual theories propounded in Plaintiffs' responsive memorandum are divorced from Plaintiffs' own complaint, from Minnesota election law, and from the facts of the state's election processes. These theories should therefore be rejected.

9

## II.   PLAINTIFFS' LEGAL THEORY IS CONTRARY TO ALL RELEVANT CASE LAW.

As the Secretary explained in his initial memorandum, in order to prevail in this action Plaintiffs must demonstrate that a ballot-order statute that places candidates from the party that is currently in power in the state last on election ballots violates the constitutional rights of that party's organizations and supporters. No court has ever held that an incumbent-penalizing ballot-order statute like Minnesota's places any burden on party organizations' or voters' constitutional rights.

Plaintiffs rely on a line of case law that is facially inapposite to the facts of this case. With the exception of a single Arizona court decision involving alphabetical order rather than incumbent status, *see Kautenburger v. Jackson*, 333 P.2d 293 (Ariz. 1958), every ballot-order case that Plaintiffs cite involved an incumbent-protection scheme— that is, a statute that operated either on its face or as applied to reward incumbent candidates or parties with the top line on the ballot. Under the express holding of the Eighth Circuit, Minnesota's statute has precisely the opposite effect. As a result, Plaintiffs' legal argument fails.

### A.   Binding Eighth Circuit Precedent Proves that the Challenged Statute is *Not* "Incumbent-First."

Plaintiffs assert that the challenged ballot-order statute creates an "incumbent first" system that will harm Plaintiffs by granting top ballot position to Republican candidates. (Pls.' Resp. Mem. 10-13.) For the reasons discussed above, Plaintiffs' newfound allegations are devoid of factual support. The complaint does not and cannot allege that an incumbent office-holder will be listed at the top of the ballot in a single

2020 race, much less a race that implicates these particular Plaintiffs' constitutional rights. Plaintiffs cite the presidential race as a case-in-point of the statute's favoritism toward an incumbent officeholder—but, as explained above, this is an unfounded and very dubious assumption.

Regardless, Plaintiffs' legal argument on this point is refuted by binding appellate precedent. The Eighth Circuit's decision in *McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980), blocks any attempt to contend that the Minnesota statute creates an "incumbent first" scheme.

The Minnesota statute that Plaintiffs challenge is the exact mirror image of the one that the Eighth Circuit invalidated in *McLain*. *See McLain*, 637 F.2d at 1166. While both statutes require election officials to calculate the average number of votes that each major party received in the previous general election, the Minnesota statute provides that the major parties are to be arranged on the next general-election ballot from the smallest average number of votes to the largest. Minn. Stat. § 204D.13, subd. 2. The North Dakota statute in *McLain* prescribed precisely the opposite order. *McLain*, 637 F.2d at 1166. Crucially, it was for this very reason that the Eighth Circuit held that the North Dakota statute created an "'incumbent first' ballot procedure." *Id.* at 1166-67.

Plaintiffs now contend that because, on occasion, the Minnesota statute can lead to an individual incumbent office-holder being listed first on the ballot, the statutory policy is "incumbent first." But this ignores *McLain*. Under the North Dakota statute, an incumbent office-holder occasionally found him- or herself *second* or lower on a general election ballot—but the existence of that infrequent exception did not prevent the Eighth

...

Circuit from holding that the statute fundamentally constituted an "incumbent first" scheme. *See id.* The mandatory logical implication of this holding, one that has binding precedential effect in this lawsuit, is that that variety of occasional exception fails to render the Minnesota statute "incumbent first." Plaintiffs' alternative, under which the North Dakota statute and its precise opposite are *both* "incumbent first" schemes, is logically absurd.

### B. The Challenged Statute Should Be Upheld Under Either Rational Basis Review or the *Anderson*/*Burdick* Balancing Test.

The *McLain* court held that "most courts" in the line of federal court precedent examining incumbent-protection ballot-order statutes have applied rational-basis review. *Id.* at 1167. As a result, the Eighth Circuit examined the North Dakota statute under that standard. *Id.* Plaintiffs contend that this Court should instead examine the Minnesota statute under the more recent burden-balancing test described by the U.S. Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Those decisions hold that election regulations inevitably impose some burdens on individuals' rights to vote and to associate with others for political purposes. *Anderson*, 460 U.S. at 788. As a result, courts do not broadly subject election regulations to strict scrutiny; doing so "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Instead, courts tailor the level of scrutiny applied to each case according to the particular details of the private rights and government interests that are implicated:

> [A] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the

> First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interest put forward by the state as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's right.

*Id.* at 434. When state law subjects First and Fourteenth Amendment rights to "severe" restrictions, courts apply strict scrutiny. *Id.* But when the law only imposes restrictions on constitutional rights that are reasonable and nondiscriminatory, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

The Court should apply rational-basis review for the reasons described by the *McLain* court and its predecessors examining incumbent-protection schemes. In turn, the Minnesota statute should be upheld for the reasons provided in the Secretary's initial memorandum. (*See* Secretary's Mem. 5-14.) But if, in the alternative, the Court elects to apply the *Anderson*/*Burdick* balancing test, the statute should nonetheless be upheld, because the ballot-order policy created by Minn. Stat. § 204D.13, subd. 2, only imposes restrictions on constitutional rights that are reasonable, nondiscriminatory, and justified by the state's important regulatory interests. *See Burdick*, 504 U.S. at 434.

The ballot-order policy is reasonable, in large part, because it only assigns low ballot positions to major political parties that have already achieved substantial control over the levers of power in state government. It is nondiscriminatory because, by directly apportioning ballot priority to major parties in inverse proportion of their representation in government, the policy is narrowly tailored to the state's interest in promoting political diversity and counteracting the incumbent effect. Finally, the state's desire to promote the

survival of small major parties and discourage sustained one-party control of government constitute important regulatory interests. Plaintiffs' claims therefore fail.

The distinction between rational basis review and *Anderson/Burdick* balancing is of relatively lesser significance in this case because of the fact, recognized by *McLain* and a number of other decisions examining ballot-order provisions, that the burden that the "primacy effect" places on voters' and party organizations' constitutional rights is a minor one. *See, e.g.*, *McLain*, 637 F.2d at 1167 (holding that "the placement of candidates on a ballot does not involve absolute exclusion" and that "[t]hus, although ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated"). This is even more the case in the current lawsuit than it is in the "incumbent first"-centered line of precedent, given that in this case the two political parties that hold effectively every relevant political office will have their candidates listed third and fourth on the ballot (*see* Compl. ¶ 27), rather than first and a lower position.

For these reasons, the challenged statute should be upheld under either rational basis review or the *Anderson/Burdick* balancing test.

### C. The "Incumbent Effect" is a Thoroughly Established Fact Inherent in Representative Democracy.

In his initial memorandum, the Secretary noted that one significant basis for the challenged statute is the state's interest in reducing the incumbent effect. (Secretary's Mem. 9.) Plaintiffs respond contemptuously to this idea, complaining that the very concept of the incumbent effect is "something the Secretary seems to have invented from whole cloth and asserts without a scintilla of academic or legal support." (Pls.' Mem. 18.)

Plaintiffs' histrionics are misplaced. The incumbent effect is an inherent aspect of representative democracy that is familiar to effectively every experienced participant in the electoral system. Countless federal courts have recognized both that incumbency advantages exist and that they are all but universally recognized in political circles. *See, e.g.*, *6th Cong. Dist. Republican Cmte. v. Alcorn*, 913 F.3d 393, 404-05 (4th Cir. 2019) (holding that "[i]ncumbents are already blessed with myriad de facto advantages in the electoral arena," including "better name recognition than challengers because of their time in the public eye," "the opportunity to win votes by enacting popular laws and servicing their constituents, and . . . easier access to donors, as they are proven winners. All this contributes to the 'scare-off' effect: potential challengers, faced with the seemingly insurmountable hurdles, will decide not to run"); *Chisom v. Edwards*, 690 F. Supp. 1524, 1536 (E.D. La. 1988) (holding that court "cannot ignore the tremendous power and benefits of incumbency," which are "well recognized by all who are knowledgeable students of the electoral process").[4] Moreover, the Supreme Court has held that states have a legitimate interest in enacting policies that counteract the

---

[4] *See also, e.g.*, *Davis v. Chiles*, 139 F.3d 1414, 1422 (11th Cir. 1998) (discussing "the powerful effect of incumbency in judicial elections"); *Buckley v. Valeo*, 519 F.2d 821, 868-69 (D.C. Cir. 1975) (noting "steps taken" by Congress "to diminish incumbency advantage"), *rev'd in part on other grounds*, 424 U.S. 1 (1976); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 615 (S.D. Tex. 2018) (examining extent of incumbency advantage enjoyed by particular holders of Texas state judicial offices); *Texas v. U.S.*, 887 F. Supp. 2d 133, 177 (D. D.C. 2012) (discussing incumbency advantage in Texas congressional and state legislative districts); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 397, 403, 440 (S.D. N.Y. 2004) (discussing incumbency advantage in New York congressional and state legislative districts); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1306-07 (S.D. Fla. 2002) (examining extent of incumbency effect in Florida congressional districts).

incumbent effect for the purpose of protecting "democratic accountability." *See Randall v. Sorrell*, 548 U.S. 230, 248-49 (2006) (holding, in context of campaign-finance regulation, that "contribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability"). The *Randall* Court, like numerous other federal courts discussing the incumbent effect, treated the existence of the effect as so self-evident that it required no specific introduction or analysis. This Court should do the same.

### D. Plaintiffs' Contention that They Are Similarly Situated to the New Major Parties but Not to Prominent Minor Parties is Unavailing.

Finally, Plaintiffs' attempt to demonstrate that they, as organizations and voters associated with the powerful Minnesota Democratic-Farmer-Labor party, are similarly situated to organizations and voters connected to the Legal Marijuana Now party fails because it fundamentally misconstrues the nature of the similarly-situated inquiry.

As the Secretary noted in his initial memorandum, Plaintiffs fail to state an Equal Protection Clause claim because, in addition to the problems discussed above, Plaintiffs cannot demonstrate that they are similarly situated to Legal Marijuana Now party organizations and voters. (*See* Secretary's Mem. 14-15.) Plaintiffs now argue that they are similarly situated to Legal Marijuana Now party figures because Minnesota law categorizes both the DFL and the Legal Marijuana Now party as major political parties. This argument, however, is founded on a fundamental misreading of Fourteenth Amendment case law. To state a claim under the Equal Protection Clause, plaintiffs must

prove that they are similarly situated to the comparison group "in all relevant respects," not merely with regard to a single legal formalism. *Carter v. Arkansas*, 392 F.3d 965, 968-69 (8th Cir. 2004); *see also Foster v. City of St. Paul*, 837 F. Supp. 2d 1024, 1031 (D. Minn. 2011) (holding that equal protection plaintiff "must show that he was similarly situated in all relevant respects").

Plaintiffs' interpretation of the similarly-situated inquiry would turn equal protection law on its head. If a plaintiff were only required to show that he is similarly situated to a comparison entity on the basis of a single legal formalism, government bodies would be subject to equal protection lawsuits in any and every situation in which a law or government policy treated two private entities as equivalent in any respect whatsoever, no matter how narrow or how divorced from the grounds for disparate treatment in a different context. This is not the law.

Plaintiffs make the same mistake in the opposite direction later in their memorandum. As the Secretary previously explained, Plaintiffs' constitutional claims must fail because they prove too much: if the "primacy effect" that the Legal Marijuana Now party will enjoy in the 2020 election imposes such a heavy burden on Plaintiffs' constitutional rights that it overwhelms the state's regulatory interests underlying the ballot-order statute, then the remedy that Plaintiffs seek (which would spread that effect equally among the four major parties but leave all minor-party and independent candidates restricted to the bottom of the ballot) cannot avoid being unconstitutional for exactly the same reasons. (*See* Secretary's Mem. 16-17.) Plaintiffs cannot argue that the

proper remedy for an unconstitutional statute is a court order that would be unconstitutional for exactly the same reasons that they claim the statute is.

Plaintiffs attempt to escape this problem by repeating their misapplication of the "similarly situated" inquiry: they assert that the DFL cannot possibly be similarly situated to a minor party such as the Independence Party or Green Party, because those entities do not currently possess the legal formalism of major-party status under Minnesota law. But again, this is simply not how the equal protection inquiry works. If, as Plaintiffs contend, the distinctions that the challenged statute draws between the DFL and the Legal Marijuana Now party are constitutionally impermissible, it is difficult to understand how the major-party label itself, as applied to relegate minor-party and independent candidates to the bottom of the ballot, could be anything but a violation of the Equal Protection Clause. Plaintiffs' Fourteenth Amendment claim therefore fails.

## CONCLUSION

For the reasons provided above and in his principal memorandum, the Secretary respectfully requests that the Court grant his motion and dismiss Plaintiffs' complaint.

Dated: January 31, 2020                  Respectfully submitted,

                                                                     KEITH ELLISON
                                                                      Attorney General
                                                                      State of Minnesota

                                                                      s/ **Nathan J. Hartshorn**
                                                                     NATHAN J. HARTSHORN
                                                                      Assistant Attorney General
                                                                      Atty. Reg. No. 0320602

                                                                      445 Minnesota Street, Suite 1800
                                                                      St. Paul, Minnesota 55101-2134
                                                                      (651) 757-1252 (Voice)
                                                                      (651) 297-1235 (Fax)
                                                                      nathan.hartshorn@ag.state.mn.us

                                                                      ATTORNEY FOR DEFENDANT