## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Madeline Pavek, Ethan Sykes, DSCC, and DCCC,<br><br>                 Plaintiffs,<br><br>v.<br><br>Steven Simon, in his official capacity as the Minnesota Secretary of State,<br><br>                 Defendant. | Case No. 19-cv-3000 (SRN/DTS)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Alexi Machek Velez, Jyoti Jasrasaria, and Marc E. Elias, Perkins Coie LLP, 700 13th Street, N.W., Suite 600, Washington, D.C., 20005-3960; Kevin J. Hamilton, Perkins Coie LLP, 1201 Third Avenue, Suite 4900, Seattle, WA 98101-3099; Katherine M. Swenson and Sybil L. Dunlop, Greene Espel PLLP, 222 South 9th Street, Suite 2200, Minneapolis, MN 55402, for Plaintiffs.

Nathan J. Hartshorn, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1800, Saint Paul, MN 55101-2134, for Defendant.

Cameron Thomas Norris, Jeffrey M. Harris, and William S. Consovoy, Consovoy McCarthy PLLC, 1600 Wilson Boulevard, Suite 700, Arlington, VA 22209; Thomas H. Boyd, Winthrop & Weinstine, PA, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402-4629, for Amicus Curiae Honest Elections Project.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Defendant Secretary of State Steve Simon's

(Defendant or "Secretary") Motion to Dismiss (Doc. No. 13) and Plaintiffs Madeline

Pavek's, Ethan Sykes's, DSCC's, and DCCC's Motion for a Preliminary Injunction (Doc.

No. 22).  Both motions have been fully briefed and were jointly argued to the Court.[1]

Additionally, the Court has also received briefing from amicus curiae Honest Elections

Project in support of Defendant's opposition to Plaintiffs' preliminary injunction motion

(*see* HEP Mem. [Doc. No. 50]), to which Plaintiffs have responded.  (*See* Pls.' Opp'n to

HEP's Mem. (Pls.' HEP Opp'n Mem.) [Doc. No. 52].)  For the following reasons, the

Court grants Plaintiffs' Motion for a Preliminary Injunction, and denies Defendant's

Motion to Dismiss.

## I.     BACKGROUND

This election law dispute arises out of Minn. Stat. § 204D.13, subd. 2 (2018),

referred to as the "Ballot Order" statute.  (*See* Compl. [Doc. No. 1] ¶¶ 1, 4, 6.)  By its terms,

the statute requires that in Minnesota general elections, major political party candidates

must be listed, on the ballot, in reverse order based on the average number of votes that

their party received in the last state general election.  (*Id.* ¶ 3.)  Because the Democratic-

Farmer-Labor Party ("DFL") received the highest average vote share in the most recent

Minnesota general election, it appears that the Ballot Order statute requires all DFL-

affiliated candidates to be listed last after all other major political party candidates on the

ballot for the 2020 General Election, while the poorest performing major political party

candidates are listed first.  (*Id.* ¶ 4.)

---

[1]     (*See* Pls.' Prelim. Inj. Mem. (Pls.' PI Mem.) [Doc. No. 24]; Def.'s Prelim. Inj. Opp'n
Mem. (Def.'s PI Opp'n Mem.) [Doc. No. 32]; Pls.' Prelim. Inj. Reply Mem. (Pls.' PI Reply
Mem.) [Doc. No. 43]; Def.'s Mot. to Dismiss Mem. (Def.'s MTD Mem.) [Doc. No. 15];
Pls.' Mot. to Dismiss Opp'n Mem. (Pls.' MTD Opp'n Mem.) [Doc. No. 18]; Def.'s Mot.
to Dismiss Reply Mem. (Def.'s MTD Reply Mem.) [Doc. No. 20].)

Such an arrangement, Plaintiffs claim, impermissibly conveys an "arbitrary, across-the-board advantage" to the poorest performing major political party candidates solely on the basis of party affiliation.  At the same time, Plaintiffs allege it inflicts an "increasing electoral disadvantage" to party candidates listed later on the ballot, through a phenomenon known as the "primacy effect," whereby first-listed candidates receive more votes solely as a result of their first-listed position.  (*Id.* ¶ 1.)  Plaintiffs contend that in doing so, the Ballot Order statute places an undue burden on the right to vote as well as the right to political association in violation of the First and Fourteenth Amendments to the United States Constitution.  They ask the Court to declare the statute unconstitutional and enjoin the Secretary from enforcing it.  (*Id.* ¶¶ 6, 41–54.)

### A.    The Parties

Plaintiffs consist of two individual Minnesota voters, and two Democratic party political committees.[2]  Plaintiff Madeline Pavek is a resident of, and registered voter in, Minneapolis, Minnesota, who has voted consistently for DFL party candidates in the past

---

[2]    In setting forth the facts of this case, the Court notes that its consideration of the record necessarily differs for each motion at issue.  With respect to Defendant's motion to dismiss, the Court "assumes as true all factual allegations in the pleadings, interpreting them most favorably to [Plaintiffs], the nonmoving party."  *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1128 (8th Cir. 2019).

With respect to Plaintiffs' motion for a preliminary injunction under Fed. R. Civ. P. 65, the Court makes preliminary factual findings and conclusions of law based on the limited record before it.  *See CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 798 (D. Minn. 2018).  Such findings and conclusions, however, "are not final determinations of disputed matters binding in later stages of litigation[,]" as it is a " 'general rule' " that findings of fact and conclusions of law made by a court at the preliminary injunction stage are not binding at trial on the merits.  *Id.* (citation omitted); *see also Cambria Co. LLC v. Schumann*, No. 19-cv-3145 (NEB/TNL), 2020 WL 373599, at *3 (D. Minn. Jan. 23, 2020) (acknowledging discovery could ultimately change the likelihood of success on the merits).

3

and intends to do so again in the upcoming 2020 general election.  (Compl. ¶ 12; *see also* Pavek Decl. [Doc. No. 27] ¶¶ 1–3.)  Pavek is actively involved in efforts to help elect DFL candidates in Minnesota and is the statewide Political Director for the Minnesota Young DFL and the Stonewall DFL (the DFL's LGBTQ caucus).  (Pavek Decl. ¶ 3.)

Plaintiff Ethan Sykes is a resident of, and registered voter in, Butterfield, Minnesota, who will be voting for the first time in November 2020, and who intends to vote for DFL candidates.  (Compl. ¶ 13; *see also* Sykes Decl. [Doc. No. 25] ¶¶ 1–2.)  Sykes is actively engaged in efforts to elect DFL candidates in Minnesota and serves as a member of the Minnesota State University Mankato College Democrats.  (Sykes Decl. ¶ 2.)

Plaintiff DSCC is the national senatorial committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14) (2018), and works to elect candidates of the Democratic Party to the U.S Senate, including in Minnesota.  (Compl. ¶ 14; *see also* Schaumburg Decl. [Doc. No. 28] ¶ 2.)  In the past, DSCC has made significant contributions and incurred significant expenditures to persuade and mobilize voters in support of DFL Senate candidates and intends to do so for the general election this fall.  (Compl. ¶ 14; Schaumburg Decl. ¶ 11.)

Plaintiff DCCC is the national congressional committee of the Democratic party, as defined by 52 U.S.C. § 30101(14), and works to elect candidates of the Democratic Party to the U.S. House of Representatives, including in Minnesota.  (Compl. ¶ 15; *see also* Guinn Decl. [Doc. No. 26] ¶ 2.)  Much like the DSCC, the DCCC has made significant contributions and incurred significant expenditures to persuade and mobilize voters in

support of DFL congressional candidates and intends to do so for the general election this
fall.  (Guinn Decl. ¶¶ 2, 4–5, 17, 20.)

Steve Simon is the Secretary of State of Minnesota and is named as Defendant in
his official capacity.  (*Id.* ¶ 16.)  As Minnesota's chief elections officer, the Secretary is
responsible for the administration and implementation of election laws in Minnesota,
including the Ballot Order Statute, and any other rules for preparing the state general
election ballot.  (*Id.* (citing Minn. Stat. § 204D.13, subd. 2; Minn. Stat. § 204D.11, subd. 1
(2018) (requiring local election officials to prepare state general election ballot subject to
rules of secretary of state)).)  This includes creating the ballot—and the order of partisan
candidates' names—to be used in Minnesota's elections pursuant to state law.  *See* Minn.
Stat. § 204D.09, subd. 1 (2018) (requiring Secretary to supply local election officials with
copy of example ballot to be used in state primary and general elections and requiring that
official ballot conform to example ballot); Minn. R. 8250.1810, subp. 9 (2018) (requiring
the Secretary to "certify to the county auditors the order in which the names of the
candidates representing the [major] political parties . . . must appear for every partisan
office on the ballot"); *Id.*, subp. 18 (2018) (requiring official ballot to conform "in all
respects to the example ballot" provided by the Secretary).

Non-party amicus curiae, the Honest Elections Project ("HEP"), is a self-described
nonpartisan organization "devoted to supporting the right of every lawful voter to
participate in free and honest elections."  (HEP Mem. at 1.)  It contends that it "defends the

fair, reasonable measures that voters put in place to protect the integrity of the voting process" through "public engagement, advocacy, and public interest litigation."[3] (*Id.*)

### B.   Minnesota's Ballot Order Statute

The "Ballot Order" statute, set forth at Minn. Stat. § 204D.13, subd. 2, provides in relevant part:

> The first name printed for each partisan office on the state general election ballot shall be that of the candidate of the major political party that received the smallest average number of votes at the last state general election. The succeeding names shall be those of the candidates of the other major political parties that received a succeedingly higher average number of votes respectively. For the purposes of this subdivision, the average number of votes of a major political party shall be computed by dividing the total number of votes counted for all of the party's candidates for statewide office at the state general election by the number of those candidates at the election.

Under the statute, candidates for partisan office on the state general election ballot that have been nominated by a "major political party" that received the *smallest* average number of votes appear first on the general-election ballot, followed by major political party candidates that received the second-smallest average number, and so on. *Id.* The statute has existed in that format since 1981. *Compare* Minn. Stat. § 204D.13, subd. 2 (Supp. 1981), *with* Minn. Stat. § 204D.13, subd. 2 (2018).

By its terms, the Ballot Order statute's requirements apply only to candidates of "major" political parties in partisan races. *See* Minn. Stat. § 204D.13, subd. 2. Relevant here, one method of becoming a "major political party" in Minnesota is to present at least

---

[3]      On March 26, 2020, the Court permitted HEP to file an amicus brief in opposition to Plaintiffs' motion for a preliminary and permanent injunction. (*See* Doc. No. 49); *Pavek v. Simon*, No. 19-cv-3000 (SRN/DTS), 2020 WL 1467008 (D. Minn. Mar. 26, 2020) (explaining procedural history of, and basis for granting, HEP's motion).

one candidate for election to a statewide office in a general election who subsequently receives at least five percent of the total number of votes cast for that particular election. *See* Minn. Stat. § 200.02, subd. 7(a) (2018).   Once a party becomes a "major political party," it retains that status for at least two general election cycles, even if the party fails to maintain that same level of support in future elections.   *See* Minn. Stat. § 200.02, subd. 7(d) (2018).

### C.   Minnesota's 2018 General Election Results & Effect On Ballot Order for Minnesota's November 2020 General Election

Minnesota's most recent general election was in 2018.   According to the Secretary's website, DFL-affiliated candidates received the highest average number of votes for statewide office positions in Minnesota's 2018 General Election, followed by Republican-affiliated candidates.[4]   Two smaller Minnesota parties, the Grassroots-Legalize Cannabis Party and the Legal Marijuana Now Party, each gained "major" party status for the first time because each party ran a candidate for statewide office that received more than five percent of the statewide vote for that particular office.[5]   Accordingly, for Minnesota's

---

[4]   *See generally 2018 General Election Results* (henceforth, MN 2018 General Election Results), Minn. Secretary of State (last visited June 15, 2020), https://www.sos.state.mn.us/elections-voting/election-results/2018/2018-general-election-results/ (showing that DFL statewide candidates received an average of 1,359,707 votes, and Republican statewide candidates received an average of 1,081,464 votes).   The Court takes judicial notice of Minnesota's election results published by the Minnesota Secretary of State on its website.   *See Green Party of Ark. v. Martin*, 649 F.3d 675, 679 (8th Cir. 2011) (taking judicial notice of election results on Arkansas Secretary of State website).

[5]   *See* MN 2018 General Election Results *supra* n.4 (indicating that the Legal Marijuana Now party candidate for Minnesota State Auditor received 5.28% of the total vote for that election, and that the Grassroots-Legalize Cannabis party candidate for Minnesota Attorney General received 5.71% of the total vote for that election).

November 2020 General Election, there are four "major" political parties subject to the Ballot Order statute: the Democratic-Farmer-Labor party, the Republican party, the Legal Marijuana Now party, and the Grassroots-Legalize Cannabis party.[6]  Both Plaintiffs and Defendant acknowledge that if the Legal Marijuana Now party (which received less votes than the Grassroots-Legalize Cannabis party in the last general election) puts forth a partisan candidate for statewide office, that candidate will be listed first on the ballot, followed by any candidate offered by the Grassroots-Legalize Cannabis party, then Republican party candidates, and finally, DFL candidates.[7]  (*See* Compl. ¶¶ 4, 27; Def.'s MTD Mem. at 2–3; Dep. Tr. of David Maeda as Rule 30(b)(6) Deponent for Minnesota Secretary of State (Maeda Dep. Tr.) [Doc. No. 53-1] at 21 (acknowledging partisan candidate order for Minnesota's 2020 General Election ballot.)

### D.    The Primacy Effect

Plaintiffs contend that this order of candidates conveys an "arbitrary, across-the-board advantage" to the candidates of whichever major political party garnered the least support in the most recent general election because of something known as "position bias" and the "primacy effect." (Compl. ¶ 1.)  The "primacy effect" is the theory that candidates

---

[6]     *See Political Parties*, Minn. Secretary of State (last visited June 15, 2020), https://www.sos.state.mn.us/elections-voting/how-elections-work/political-parties (listing forth the four current major political parties and three minor political parties in Minnesota).

[7]     The Secretary has already created an example ballot, published on its website, showing this anticipated order in conformance with the Ballot Order statute's requirements. *See 2020 Example Ballot*, Minn. Secretary of State (last visited June 15, 2020), https://www.sos.state.mn.us/media/4092/2020-primary-general-and-judicial-example-ballots.pdf.

listed first on a ballot receive an electoral advantage over all candidates listed below them, solely as a result of being listed first.   (*Id.*)   Plaintiffs offer—without challenge or refutation—two expert reports discussing the effect.

### 1. Dr. Rodden's Report on the Primacy Effect in Minnesota

The first report, from Dr. Jonathan Rodden, analyzes whether there is evidence of an electoral advantage associated with "ballot primacy" in Minnesota's past elections.   (*See* Velez Decl. Ex. 1 Expert Report of Dr. Jonathan Rodden (Rodden Rpt.) [Doc. No. 29-1] at 2.)   Dr. Rodden is a Professor of Political Science at Stanford University, and the director of the Stanford Spatial Social Science Lab, which conducts research and analysis on the use of geo-spatial data in the social sciences.   (*Id.* at 6.)   He has significant experience working on large "fine-grained geo-spatial data sets" and has previously testified as an expert in election cases.   (*Id.* at 5–7.)   He holds a Bachelor of Arts degree in political science from the University of Michigan, and obtained his doctorate in political science from Yale University.   (*Id.* at 5–6.)

Dr. Rodden notes that a large body of social science literature has attempted to explore the "subtle psychological bias toward selecting the first option from among a set of options that is presented in visual form."   (*Id.* at 8.)   The bias, he notes, has been documented in research on consumer choice, test-taking, survey response and, most notably, in elections.   (*Id.*)   Numerous studies on the issue have confirmed that first-listed candidates on a ballot have an advantage over later-listed candidates.   (*Id.* at 8–9.)

To determine whether the "primacy effect" exists in Minnesota, Dr. Rodden collected county-level data on Minnesota's general election results and ballot order, along

with a variety of other demographic and political indicators, from 1982 through 2018.  (*Id.* at 2.)   After analyzing the data using a series of regression models that controlled for numerous factors (*see id.* at 17–23), Dr. Rodden concluded that, all other things being equal, party candidates listed first on a ballot can expect a "clear and discernable" electoral advantage in the form of higher vote share than if they were listed lower on the ballot.  (*Id.* at 5, 17.)  His analysis sets forth average primacy effect boosts for the various Minnesota major political parties.  For example, Dr. Rodden observes, when DFL candidates were listed first on the ballot,[8] they received approximately 1% more of the vote share than when listed later on the ballot, and approximately 3% more in elections with no incumbent.  (*Id.* at 4.)  Republican candidates received approximately 2.6% more of the vote share when listed first, and approximately 2.9% more in elections with no incumbent.  (*Id.*)  The Reform and Independence parties, which at various points in time have been "major political parties" in Minnesota, received about 4.2% more of the vote share when listed first, and 5.5% more in elections with no incumbent.  (*Id.*)  And the Green Party, also occasionally a "major political party," received about 1.3% more of the vote share when listed first, and about 1.5% more in elections with no incumbent.  (*Id.*)

Dr. Rodden also notes that recent evidence from North Carolina provides a useful example of the significance of the primacy effect.  (*Id.* at 23–24.)  Prior to 2018, North Carolina listed all general-election candidates by order of the partisan vote share their party

---

[8]     DFL candidates are seldom first on Minnesota's ballot because Republican party candidates have only received more votes than DFL candidates four times since 1982. (Rodden Rpt. at 12–13.)

received in the most recent gubernatorial election.  (*Id.* at 24.)  Under this practice, if, for example, a Republican candidate was elected as governor in North Carolina in 2012, all Republican candidates would be listed first on the entire ballot for two subsequent election cycles.  (*Id.*)  In 2018, this practice was replaced by a modified alphabetical ordering system—in which a letter of the alphabet is selected by random drawing and candidate names are listed on the ballot in alphabetical order beginning with the drawn letter—which resulted in Republican and Democrat candidates being listed first on only around half of the ballots in North Carolina's 2018 general election.  (*Id.* at 24–25.)

Since Republican candidates were listed first on all ballots in 2016, North Carolina's new ballot order practice in 2018 inadvertently created a "treatment" and "control" group. (*Id.*)  Researchers could compare prior election results under the old "primacy" system (in 2016), in which Republicans were listed first on all ballots, against election results under the new modified alphabetical system (in 2018), in which Republican and Democrat candidates were listed first an approximately equal number of times, to see if there was a noticeable change in vote share.  (*Id.* at 25–26.)

The results of such a comparison were "striking."  While the average contested precinct in North Carolina experienced a 3.2% shift towards Democratic candidates overall in 2018, the shift was about 1.5% higher in precincts where Republican candidates were no longer listed first.  (*Id.* at 26.)  Moreover, in elections with no incumbent—which lack informational cues for voters such as an incumbent's name and history—Democrat candidates' vote share increased *by over 8%* in precincts where Republicans were no longer listed first on the ballot.  (*Id.* at 27.)  Even where the same two candidates from the prior

general election ran again, there was still a 4% increase in vote share for Democrat candidates where Republican candidates were no longer listed first.  (*Id.* at 28.)  Put simply, Dr. Rodden concludes, "the North Carolina quasi-experiment provides a clear demonstration of the advantage associated with ballot order primacy."  (*Id.*)

### 2.   Dr. Krosnick's Report on Scholarly Research Regarding the Primacy Effect

The second report offered by Plaintiffs, from Dr. Jon A. Krosnick, analyzes whether the Ballot Order statute is likely to have any impact on vote shares in Minnesota elections based on a review of extensive literature on the primacy effect in elections.  (*See* Velez Decl. Ex. 2 Expert Report of Dr. Jon A. Krosnick (Krosnick Rpt.) [Doc. No. 29-1] at 2.) Dr. Krosnick is the Frederic O. Glover Professor of Humanities and Social Sciences, and a Professor of Communication and Political Science, at Stanford University.  (*Id.* at 3.)  He is also a research scientist for the United States Census Bureau, a research advisor for Gallup, and an accomplished author in his field.  (*Id.*)  He holds a Bachelor of Arts degree in psychology from Harvard University, and has earned a Masters' degree and Ph.D. in social psychology from the University of Michigan.  (*Id.*)  He has conducted research on candidate name ordering effects for the past twenty-five years, and has testified as an expert witness on name order in four cases, as well as before the Nevada legislature.  (*Id.*)

For his report, Dr. Krosnick reviewed 70 years of scholarly research on candidate name order, including his own work.  (*Id.* at 5.)  In doing so, he categorized the scholarly research by election type and geographic location (*Id.* at 10–27), assessed unusual or outlier results (*Id.* at 15–17), analyzed the consistency of the literature's conclusions in order to

confirm that the research was not unanimous as a result of chance (*Id.* at 24–25), and explained *why* name order effects occur, *when* they are expected to occur, and *where* the effects are typically most significant.  (*Id.* at 28–35.)  Dr. Krosnick offers four opinions:

(1) Listing a candidate's name first on the ballot "almost always" accords that person a "primacy effect" advantage in gaining votes;

(2) Candidate name order effects have been extensively studied in different electoral settings for decades, and the body of accumulated evidence illustrates that the "primacy effect" on first-listed candidates is based *solely* on their first-listed position;

(3) Name order effects are typically observed where voters lack information about, or feel ambivalent towards, candidates and are "nudge[d]" towards the first candidate on a ballot as a result; and

(4) Because primacy effects have been found virtually everywhere that candidate name order effects have been studied, it is "extremely likely" that primacy effects have occurred and will occur in Minnesota.

(*Id.* at 2 (emphasis added).)  It is worth noting that when analyzing the consistency of the research at issue, Dr. Krosnick found that out of 1,061 statistically significant tests conducted on name order effects, 91% indicated primacy effects.  (*Id.* at 25.)

### E.   Procedural History

On November 27, 2019, Plaintiffs filed their complaint against Defendant seeking to invalidate the Ballot Order Statute, Minn. Stat. § 204D.13, subd. 2, as unconstitutional. (*See* Compl. ¶¶ 1, 4, 6.)  Plaintiffs contend because the Ballot Order statute requires a fixed ballot order that places the poorest performing major party first on the ballot, the statute confers—by virtue of the primacy effect—a "state-mandated, systemic, and entirely arbitrary advantage," to "a single political party and all of the candidates who affiliate with it, for no other reason than their political affiliation." (*Id.* ¶ 3; *see also id.* ¶ 23.)  Moreover,

13

Plaintiffs contend, the "entirely arbitrary advantage" of the primacy effect specifically harms Plaintiffs, who all either plan to vote for DFL-affiliated candidates or financially support their campaigns and election prospects.  (*Id.* ¶ 4.)  Because the DFL received the highest average vote share in the last state general election, the Ballot Order statute requires all DFL-affiliated candidates to be listed last on the 2020 General Election ballot.  (*Id.* ¶¶ 3–4.)

Plaintiffs' complaint sets out two counts.  Count One, brought pursuant to 42 U.S.C. § 1983 (2018) and 28 U.S.C. §§ 2201–2202 (2018), alleges that the Ballot Order statute constitutes an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the United States Constitution.  (Compl. at p. 15.)  Plaintiffs allege that the mandate of the Ballot Order statute burdens the right to vote of those voters—including the individual voting Plaintiffs and the constituents of the organizational Plaintiffs—who support candidates of other similarly situated major political parties "because it dilutes their vote relative to the votes for the favored political party candidates that the [Ballot Order] [s]tatute requires be listed earlier on the ballot."  (*Id.* ¶ 44.)  Specifically, they assert that the "weight and impact" of their votes are "consistently and arbitrarily decreased—and the weight and impact of the votes *for the statutorily favored party's candidates, increased*— by the votes accruing to the earlier-listed candidates solely due to their earlier position on the ballot" under the Ballot Order statute.  (*Id.* ¶ 45 (emphasis added).)  Plaintiffs contend that such vote dilution is not justified by any legitimate state interest, that the Ballot Order statute is unconstitutional and, accordingly, they demand declaratory and injunctive relief. (*Id.* ¶¶ 46–48.)

14

Count Two, brought under the same statutory provisions, alleges that the mandate of the Ballot Order statute results in disparate treatment in violation of Plaintiffs' right to equal protection under the Fourteenth Amendment to the United States Constitution. (Compl. at p. 17.)  In support, Plaintiffs allege that the Ballot Order statute treats one major political party—and its candidates, members, constituencies, and the voters and organizations who support it—differently from other major political parties by giving it an unfair and arbitrary advantage based solely on the poor performance of that party's candidates in the last state general election.  (*Id.* ¶ 52.)  Put simply, Plaintiffs allege that the Ballot Order statute is state-sanctioned "favoritism" of one major political party over all others.  (*Id.* ¶ 53.)

Ultimately, Plaintiffs request that the Court (1) declare the Ballot Order statute unconstitutional; (2) preliminarily and permanently enjoin the Secretary from implementing or enforcing it; and (3) award Plaintiffs costs, disbursements and attorneys' fees incurred in bringing this action.  (Compl. at p. 19.)

On December 27, 2019, Defendant moved to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  (*See* Def. Mot. to Dismiss [Doc. No. 13]; Def.'s MTD Mem. at 3.)  After briefing was completed, Plaintiffs filed a motion for a preliminary and permanent injunction pursuant to Fed. R. Civ. P. 65, seeking to enjoin Defendant from implementing or enforcing the Ballot Order Statute, and requiring the implementation of a non-discriminatory system that gives similarly-situated major-party candidates an equal opportunity to be first on the ballot.  (*See* Pls.' Mot. for a Prelim. Inj.

(Pls.' PI Mot.) [Doc. No. 22] at 1–2.; Pls.' PI Mem.)  The Court heard oral argument on both motions on April 24, 2020.  (*See* Minute Entry [Doc. No. 54].)

Shortly after oral argument, HEP submitted a notice of supplemental authority, namely, the Eleventh Circuit's recent decision reversing and remanding a similar case finding plaintiffs in that case lacked standing.  (*See* Notice of Supp'l Authority [Doc. No. 56] (discussing *Jacobson v. Fla. Secretary of State*, 957 F.3d 1193 (11th Cir. 2020)); *see also* Pls.' Response to Supp'l Authority (Pls.' Supp'l Auth. Mem.) [Doc. No. 61].)  Additionally, at the direction of the Court, the parties also submitted a post-hearing joint stipulation addressing what technically feasible actions the Secretary could take in advance of Minnesota's November 2020 general election should the Court rule that the Ballot Order statute is unconstitutional.  (*See* Parties Joint Stip. re: Potential Relief [Doc. No. 63].)

## II.    DISCUSSION

While neither party raised any Article III standing issues in either pending motion, amicus curiae HEP asserts that Plaintiffs lack standing to sue.  Moreover, the Court "has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  Accordingly, the Court first addresses whether the Plaintiffs have standing to bring this suit.  Because the Court finds that at least one of the Plaintiffs has standing, it then considers Defendant's Motion to Dismiss, followed by Plaintiffs' Motion for a Preliminary Injunction.

### A.      Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  For a legal dispute to qualify as a "genuine case or controversy," at least one plaintiff must have "standing" to sue.  *Dep't of Commerce v. New York*, ___ U.S. ___, 139 S. Ct. 2551, 2565 (2019).  The standing doctrine " 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong' and 'confines the federal courts to a properly judicial role.' "  *Id.* (quoting *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016)).  As a jurisdictional requirement, "standing to litigate cannot be waived or forfeited."  *Virginia House of Delegates v. Bethune-Hill*, ___ U.S. ___, 139 S. Ct. 1945, 1951 (2019).

To establish Article III standing, "a plaintiff must [1] 'present an injury that is concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling.' "  *Dep't of Commerce*, 139 S. Ct. at 2565 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)).  The first requirement, often referred to as "injury in fact," requires the plaintiff to show "an invasion of a legally protected interest which is [both] concrete and particularized[] and [] actual or imminent, not conjectural or hypothetical."  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted) (internal quotation marks omitted).  The second requirement—that the plaintiffs' injury-in-fact be "fairly traceable" to the defendant's conduct—requires a showing of a "causal connection between the injury and the conduct complained of" such that the injury is " 'not . . . th[e] result [of] the independent action of some third party not before the court.' "  *Id.* at 560–61 (quoting

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).  The third requirement—whether the injury is redressable—requires a showing that it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision' " for the plaintiff.  *Id*. at 561 (quoting *Simon*, 426 U.S. at 38, 43).

As to standing, "the litigant invoking the court's jurisdiction must do more than simply allege a nonobvious harm.  To cross the standing threshold, the litigant must explain how the elements essential to standing are met."  *Id.* (citations omitted); *see also Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing these elements." (citation omitted)).  Moreover, the degree of proof required of the litigant to demonstrate standing depends on the stage of litigation at which the case rests.  *Id.*  "A party invoking federal jurisdiction must support each of the standing requirements with the same kind and degree of evidence at the successive stages of litigation as any other matter on which a plaintiff bears the burden of proof."  *Constitution Party of South Dakota v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011) (citing *Lujan*, 504 U.S. at 561.  Accordingly, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct" will suffice to establish Article III standing.  *Id.* (citing *Lujan*, 504 U.S. at 561).  At summary judgment, a plaintiff must " 'set forth by affidavit or other evidence specific facts, which for the purposes of the summary judgment motion will be taken as true[,]" to establish standing because "allegations alone are insufficient to survive a summary judgment motion[.]"  *Id.* (quoting *Lujan*, 504 U.S. at 561).

Here, HEP argues that Plaintiffs must "prove standing under 'the heightened standard for evaluating a motion for summary judgment[]' " (HEP Mem. at 4.)  HEP relies

almost entirely on *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–913 (D.C. Cir. 2015)), for this proposition.  (HEP Mem. at 4.)  In *Vilsack*, the D.C. Circuit observed that because a party must show, among other things, " a substantial likelihood of success on the merits" in order to obtain a preliminary injunction—which necessarily includes showing a likelihood of success on both substantive theories and jurisdiction—"a party who seeks a preliminary injunction must show a substantial likelihood of standing" at the preliminary injunction stage.  *Id.* at 913 (citations omitted) (internal quotation marks omitted). Plaintiffs disagree.  (Pls.' HEP Opp'n Mem. at 5–6.)

The Supreme Court does not appear to have explicitly addressed the level of proof necessary to establish standing with respect to a motion for a preliminary injunction. Similarly, the Eighth Circuit has not explicitly addressed the issue.  Recently, *without* discussing what standard should be used, the Eighth Circuit applied a pleading standard when analyzing standing on appeal from a grant of a preliminary injunction in a campaign finance case.  *See Jones v. Jegley*, 947 F.3d 1100, 1103–1105 (8th Cir. 2020) (applying pleading standard for evaluating standing, then noting that "[h]aving dealt with standing, [the court's] next task is to address whether [the plaintiff] was entitled to a preliminary injunction").  Similarly, in another recent case involving a First Amendment challenge to a state anti-loitering law that resulted in the district court granting a statewide preliminary injunction in favor of the plaintiffs, the Eighth Circuit applied a pleading standard (again, without discussion) in finding that the plaintiffs "ha[d] standing to seek a preliminary injunction."  *Rodgers v. Bryant*, 942 F.3d 451, 454–55 (8th Cir. 2019); *see also Heartland Academy Community Church v. Waddle*, 335 F.3d 684, 689 (8th Cir. 2003) (applying

pleading standard in reviewing whether plaintiffs had standing to seek a preliminary injunction).  Still, at least two of those cases[9] involved preliminary injunction motions that came prior to the commencement of discovery in the underlying case, or at least prior to any significant discovery or record development.[10]

In cases where at least some discovery has commenced, the Eighth Circuit has acknowledged the need for increased proof of standing where a challenge to standing comes at later stages in litigation.  *See Constitution Party of South Dakota*, 639 F.3d at 420–21 (noting the increasing degrees of proof of standing necessary for each "successive" stage of litigation).  And the Eighth Circuit has acknowledged that standing contests at the summary judgment stage require specific affidavit evidence.  *See Disability Support Alliance v. Heartwood Enterprises, LLC*, 885 F.3d 543, 545 (8th Cir. 2018).  Based on this precedent, the Court concludes that the Eighth Circuit would require more from the Plaintiffs than mere allegations of standing, but less than would be required in the face of a motion for summary judgment.

---

[9]     *See* Transcript of Prelim. Inj. Hr'g, *Jones v. Jegly*, 4:19-cv-00234-JM (Doc. No. 28) (E.D. Ark.) at 23–25 (indicating that the record lacked evidence that may be useful later in litigation, with the government acknowledging that at "this stage" it had offered what it could); Complaint & Motion for Prelim. Inj., 4:17-cv-00501-BRW (Doc. Nos. 1, 2) (E.D. Ark.) (reflecting that both the complaint and motion for preliminary injunction were filed contemporaneously).

[10]    Other circuits vary in their approach to this issue.  *See, e.g.*, *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 255–56 (6th Cir. 2018) (citing the D.C. Circuit and drawing distinction between failure to show likelihood of associational standing for purposes of preliminary injunction, and a failure to show standing at all for purposes of allowing the case to continue); *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (requiring "clear showing" of standing at preliminary injunction stage), *cert. denied*, 563 U.S. 989 (2011).

It does not follow, however, that the Eighth Circuit would require proof of a "substantial likelihood" of standing at this stage in the litigation. Where parties seek to enjoin a duly-enacted state statute, the Eighth Circuit has only required the litigant to show it is "likely" to prevail on the merits, and has expressly declined to adopt "substantial probability" or "substantial likelihood" tests due to the uncertain history surrounding the meaning of the phrases. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 & 732 n.4 (8th Cir. 2008). Moreover, unlike a motion for summary judgment—which can be dispositive—a preliminary injunction motion is by nature non-dispositive. Requiring litigants to prove standing at a preliminary injunction stage with the same degree of proof required at the summary judgment stage ignores both the likelihood of an incomplete record and the fact that any findings of fact or conclusions of law made by the Court for a preliminary injunction motion are not final. *See CPI Card Grp., Inc.*, 294 F. Supp. 3d at 798. As the Court discusses below, this lack of clarity in the law as to the level of proof required at this stage of the proceedings is really academic as Plaintiffs have provided ample affidavit evidence to support standing in this case.

### 1.      The DSCC and DCCC Have Direct Standing

An organization can have standing on its own behalf or on behalf of its members. *See ARRM v. Piper*, 367 F. Supp. 3d 944, 953 (D. Minn. 2019) (citing *Bowman v. W. Auto Supply Co.*, 985 F.2d 383, 388 (8th Cir. 1993)); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975) (noting that associations may have standing on their own right, or standing solely as the representative of its members). Here, the organizational Plaintiffs—the DSCC and DCCC—assert that they have both direct and associational standing to sue. (*See* Pls.'

HEP Opp'n Mem. at 6.)  As is discussed below, because the Court finds that the DSCC and DCCC have direct standing, it need not reach the question of associational standing.

The DSCC and DCCC assert that they have direct standing based on two independently sufficient harms: (1) the Ballot Order statute requires them to divert significant financial resources to counteract the unconstitutional impact of the statute in Minnesota; and (2) the Ballot Order statute directly harms the electoral prospects of both committees and the candidates they seek to have elected.  (*See* Pls.' HEP Opp'n Mem. at 6–9.)  While HEP does not appear to offer argument as to whether either organization's purported harm to its electoral prospects confers standing, it does argue that both the DSCC and DCCC have failed to show a drain of resources sufficient to establish standing because they (1) have not quantified the resources they will divert to counteract the Ballot Order statute, (2) have not explained when they will have to spend those resources; and (3) have not explained who will receive them.  (HEP Mem. at 7.)  HEP also contends that the organizations would have spent the resources in Minnesota anyway such that the funds cannot fairly be described as having been "diverted" from their intended use.  (*Id.* at 8, 10.)

In determining whether an organization has standing to sue on its own behalf, courts "conduct the same inquiry as in the case of an individual: Ha[ve] the [organizations] 'alleged such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction'?"  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 261 (1977) (citation omitted) (internal quotation marks omitted)).  Accordingly, either the DSCC or the DCCC must "[1] 'present an injury that is concrete, particularized, and actual

22

or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling.' " *Dep't of Commerce*, 139 S. Ct. at 2565 (quoting *Davis*, 554 U.S. at 733).

### a.    Injury-In-Fact

The Court finds that the DSCC and DCCC have made a sufficient showing of injury-in-fact in the form of both a diversion of resources, and harm to electoral prospects.

### i.    Diversion of Resources

The Court first addresses the DSCC's and DCCC's claims that they suffered direct injury in the form of diversion of resources to counteract the effects of the Ballot Order statute.  An organization can show injury-in-fact for standing purposes if it can show a "concrete and demonstrable injury to [its] activities which drains its resources and is more than simply a setback to its abstract social interests." *Nat'l Fed'n. of the Blind v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999) (citing *Coleman*, 455 U.S. at 379 (noting that harm to an organizations' non-abstract interests accompanied by a perceptible drain in resources is a "concrete and demonstrable injury" to the organization)); *see also Jacobson*, 957 F.3d at 1205 (" '[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.' "  (citation omitted)).

Where a "law injures [a political party] by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote[,]" such a devotion of resources constitutes an injury for the purposes of Article III standing. *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949,

951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008) (agreeing with the "unanimous view" of the Seventh Circuit that the political party at issue had standing to challenge the law). Even if the "added cost has not been estimated and may be slight," such imprecision does not affect standing, "which requires only a minimal showing of injury." *Crawford*, 472 F.3d at 951 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180–84 (2000)). Indeed, "[a]t bottom[,] the Article III standing limitation prevents a plaintiff from bringing a federal suit to resolve an issue of public policy if success does not give the plaintiff . . . some relief other than the satisfaction of making the government comply with the law." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). "If a voter can get to the polls more easily by winning the lawsuit, *or a political party can marshal its forces more effectively by winning its lawsuit,* that ought to be enough for Article III." *Id.* (emphasis added); *see also Democratic Nat'l Comm. v. Bostelmann*, ___ F. Supp. 3d ___, 2020 WL 1320819, at *3 (W.D. Wis. Mar. 20, 2020) (finding standing where Democratic Party of Wisconsin and Democratic National Committee alleged that various elections laws required them to " 'expend additional resources to assist their members and constituents to overcome [the law's effects] to exercise their right to vote' " (citation omitted)).

The Court finds that the DSCC and DCCC have made a sufficient showing of a "diversion-of-resources" direct injury sufficient to meet Article III standing requirements at this stage in the litigation. First, they have established—through undisputed evidence— that the Ballot Order statute creates a concrete and demonstrable injury to each organizations' non-abstract interests. *Cross*, 184 F.3d at 979. Each organization's mission

is to elect DFL candidates to office in either the U.S. House of Representatives or U.S. Senate, including from Minnesota.  (Guinn Decl. for DCCC ¶ 2; Schaumburg Decl. for DSCC ¶ 2.)   Electing DFL candidates is "not merely an ideological interest," *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586–87 (5th Cir. 2006).  Indeed, losing an election is more than "simply a setback to the organization's abstract social interests" *Coleman*, 455 U.S. at 379, because "[p]olitical victory accedes power to the winning party, enabling it to better direct the machinery of government towards the party's interests." *Benkiser*, 459 F.3d at 587 (citing *Storer v. Brown*, 415 U.S. 724, 745 (1974)).  Plaintiffs' undisputed evidence shows that the Ballot Order statute—and the primacy effect it gives to the poorest performing major political party's candidates—grants first-listed candidates on Minnesota ballots a "clear and discernable" advantage in the form of a higher vote share. (Rodden Rpt. at 5, 17.)  For the majority of the past 36 years, the undisputed evidence demonstrates that DFL opponents have received—when listed first on the ballot—anywhere from 1.3% to 5.5% more of the vote *solely* because of their first-listed position. (*Id.* at 4.)  And because DFL candidates will be listed last on Minnesota's 2020 General Election ballot, DFL candidates will be required to obtain more votes than they would otherwise need to overcome the first-listed advantage granted to their opponents, which is a particularly disadvantageous position to be in given the uncontroverted expectation that several elections will be competitive this fall.  (*See* Guinn Decl. for DCCC ¶¶ 16–18.) Indeed, the Secretary expressly concedes that the Ballot Order statute gives an advantage to parties that are not in power and acknowledges that even a .5% boost in vote share from

a statute would constitute a statutorily-conferred benefit for the first-listed party.  (*See* Maeda Dep. Tr. at 31–32, 70.)

Second, the DSCC and DCCC have sufficiently established diversion of their resources at this stage in the litigation.  Each has indicated that it intends to commit resources to support DFL candidates in Minnesota, and that the Ballot Order statute (and accompanying primacy effect) requires them to divert resources into Minnesota that would normally be spent in other states around the country.  (Guinn Decl. for DCCC ¶¶ 20–21; Schaumburg Decl. for DSCC ¶¶ 11–12.)  Doing so means that each organization has fewer resources to support other DFL candidates in states around the country.  (Guinn Decl. for DCCC ¶ 21; Schaumburg Decl. for DSCC ¶ 12.)   While the organizations have not provided detailed quantification of their diverted resources, even if the diversion is "slight," standing is still satisfied.  *Crawford*, 472 F.3d at 951 (citation omitted).  Moreover, "so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference or outcome].' " *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Coleman*, 455 U.S. at 379 n.20).  And at this stage in the litigation—notably, prior to summary judgment and trial—precise measurements of the diverted amount of resources are not necessary to show an injury.  *See Lujan*, 504 U.S. at 561 (requiring specific facts be set forth supporting standing at *summary judgment*, further supported by adequate evidence *at trial*); *see also Ark. ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*, 160 F.3d 433, 434 (8th Cir. 1998) (requiring specific facts quantifying resource drain at *summary judgment* stage in litigation).

HEP's arguments to the contrary are unavailing.  HEP's contention that standing is lacking because the DSCC and DCCC have not precisely quantified their diverted resources fails because such precision is unnecessary at this stage in the litigation.  *See Greystone Dev., Ltd.*, 160 F.3d at 434.  Moreover, HEP's argument that the DSCC and DCCC cannot rely on a "diversion of resources" because they would have spent the resources in Minnesota anyway ignores the nature of the DSCC's and DCCC's alleged injury.[11]  Each committee notes that its injury is not the expenditure of resources on electing Minnesota DFL candidates—which each organization acknowledges will occur regardless of the Ballot Order statute (*see* Guinn Decl. for DCCC ¶ 20; Schaumburg Decl. for DSCC ¶ 11)—but rather the *diversion* of resources from other states that were *not* originally going to be used to promote Minnesota-specific DFL candidates.  (*See* Guinn Decl. for DCCC ¶ 21; Schaumburg Decl. for DSCC ¶ 12.)  Thus, contrary to HEP's argument, the diverted resources at issue *would not* have been spent in Minnesota *but for* the Ballot Order statute's effects.

---

[11]     The cases HEP cites in support of this proposition are also distinguishable.  *See Husted*, 770 F.3d at 460 (finding lack of Article III standing at summary judgment because purported injury was harm to "abstract social interest" of "maximizing voter turnout"); *Elections Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76–77 (3d Cir. 1998) (finding naked assertion of diversion of funds insufficient *at summary judgment* where organization could not establish "any connection between the [purported source of harm] and the need for [diversion of resources for] a remedial educational campaign"); *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397 (10th Cir. 1992) (concluding that Libertarian Party lacked injury for Article III standing where allegations of increased expenditures at *summary judgment* stage lacked anything other than speculative connection to governor's purported misuse of public funds).

Finally, HEP's notice of supplemental authority—the Eleventh Circuit's recent decision in *Jacobson*, 957 F.3d at 1205–1207, where a similar challenge to Florida's "Ballot Order" statute was raised—does not alter the Court's ruling.  The Eleventh Circuit found that the DCCC lacked standing based on inadequate evidence of the diversion of resources, *see id.* at 1205–06, after a bench trial, not that diversion of resources cannot legally support standing.  *Id.* at 1198.  Accordingly, the DCCC's failure to support standing in *Jacobson* by " 'adequate[] . . . evidence adduced at trial' " does not necessitate the same finding here, where the posture of the case has not even reached summary judgment.  *See Lujan*, 504 U.S. at 561 (requiring successively more precise forms of proof of standing as litigation commences).

Moreover, the case is also factually distinguishable.  The Eleventh Circuit's ruling rested in part on the DCCC's (and other organizational plaintiffs) failure to present evidence at trial as to the activities the funds at issue were being diverted away from in order to spend those funds on combatting the primacy effect in Florida.  *Jacobson*, 957 F.3d at 1206.  Here, however, both the DSCC and DCCC have remedied that problem—at least enough to establish standing at this stage in the litigation—by explaining that the diverted resources are coming *from* their resource expenditures that would normally be used in other states to elect non-Minnesota DFL candidates to Congress.  (*See* Guinn Decl. for DCCC ¶ 21; Schaumburg Decl. for DSCC ¶ 12.)  Accordingly, unlike in *Jacobson*, both the DSCC and DCCC have adequately explained at this stage of the proceedings, "what activities, if any, might be impaired by [the DCCC's] decision to allocate 'additional resources' " to Minnesota.  *Jacobson*, 957 F.3d at 1206.

### ii.     Electoral Prospects

In the alternative, but independently sufficient to show injury-in-fact, the Court finds that the DSCC and DCCC have made a sufficient showing that their candidates' electoral prospects have been harmed.   In the election context, several circuits have recognized what has come to be known as an Article III "competitive standing" theory whereby a candidate or his political party can show direct injury if the defendant's actions hurt the candidate's or party's chances of prevailing in an election.[12]  *See, e.g.*, *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011) (upholding "competitive standing" theory that "potential loss of election" was injury-in-fact sufficient to give local candidate and party officials supporting that candidate standing), *cert. denied*, 567 U.S. 906 (2012); *Benkiser*, 459 F.3d at 586–87 (finding persuasive the argument that a political party has suffered injury-in-fact when "its congressional candidate's chances of victory would be reduced" by defendant's actions because "a political party's interest in a candidate's success is not merely an ideological interest"); *Smith v. Boyle*, 144 F.3d 1060, 1062–63 (7th Cir. 1998) (holding Illinois Republican Party and its chairman had standing to challenge Illinois Constitution's method for selecting state supreme court justices that "denie[d] [its] members . . . a fair opportunity to elect candidates of their choice"); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (noting the "well-established concept of competitors' standing" gave representative of Conservative Party sufficient Article III standing because party "stood to suffer a concrete, particularized, actual injury—competition on the ballot from

---

[12]     The Eighth Circuit does not appear yet to have addressed this theory of standing.

candidates that . . . were able to 'avoid complying with the Election Laws' and a resulting loss of votes").

Indeed, "[t]he inability to compete on an equal footing due to the application of allegedly biased criteria has been recognized in many contexts as an injury in fact sufficient to support constitutional standing." *Nat. Law Party v. Fed. Election Comm'n*, 111 F. Supp. 2d 33, 44 (D.D.C. 2000) (citing *Ne. Fla. Chapter v. Jacksonville*, 508 U.S. 565 (1993) (finding general contractors had standing to challenge city ordinance giving preferential treatment in award of city contracts to minority-owned businesses because injury in fact was "inability to compete on an equal footing" not the loss of the contract)); *see also Fulani v. Brady*, 935 F.2d 1324, 1327 (D.C. Cir. 1991) (citations omitted) (noting that "competitor standing" is usually recognized in circumstances "where a defendant's actions benefitted a plaintiff's competitors, and thereby caused the plaintiff's subsequent disadvantage"), *cert. denied*, 502 U.S. 1048 (1992). The D.C. Circuit has described the principle succinctly: "when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm under Article III." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 87 (D.C. Cir. 2005).

Moreover, as noted above, the direct injury that results from the purported illegal structuring of a competitive election is inflicted not only on candidates who are at a disadvantage, but also on the political parties who seek to elect those candidates to office. *See Owen v. Mulligan*, 640 F.2d 1130, 1133 (9th Cir. 1981) ("[The candidate] *and* the Republic[an] Committee members seek to prevent their opponent from gaining an unfair

advantage in the election process through abuses of mail preferences which 'arguably promoted his electoral prospects.' The plaintiffs have a continuing interest in preventing such practices and, thus, have standing." (citation omitted) (emphasis added)); *see also Benkiser*, 459 F.3d at 586–87 (noting that "a political party's interest in a candidate's success is not merely an ideological interest").

Here, both the DSCC and DCCC—official committees of the Democratic Party—have sufficiently established that the Ballot Order statute inflicts a concrete, particularized, imminent injury-in-fact on each committee because the statute impedes the election prospects of the Democratic candidates that each committee is attempting to support in Minnesota's 2020 General Election.  The undisputed expert evidence offered by Plaintiffs establishes that the Ballot Order statute creates a primacy effect in Minnesota where, all other things being equal, party candidates listed first on a ballot can expect a "clear and discernable" advantage in the form of higher vote share than if they were listed lower on the ballot.  (Rodden Rpt. at 5, 17.)  Moreover, it is undisputed that *all* DFL candidates in Minnesota's 2020 General Election will be listed last on the ballot *because* the Ballot Order statute requires such an order.  *See supra* § 1(C).

The resultant harm inflicted on the DSCC and DCC by the Ballot Order statute is concrete and particularized—namely, a " 'real,' and not 'abstract[,]' " injury affecting each committee distinctly and directly, even though it is not "tangible[,]" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548–49 (2016) (citations omitted))—because a political party's interest in its candidates' electoral prospects is "not merely an ideological interest." *Benkiser*, 459 F.3d at 587.  Indeed, "[p]olitical victory accedes power to the winning party, enabling it to

31

better direct the machinery of government towards the party's interests.  While power may be less tangible than money, threatened loss of that power is still a concrete and particularized injury sufficient for standing purposes."  *Id.* (citing *Storer*, 415 U.S. at 745). In fact, the Secretary *concedes* that the Ballot Order statute makes it more difficult for one party to maintain power over several election cycles, and asserts that it has a valid interest in making it harder for the party in power—currently, the DFL party—to maintain its status.  (*See* Maeda Dep. Tr. at 70.)  In other words, the Secretary concedes that the Ballot Order statute harms DFL candidates because it makes it harder for them to be elected.

The injury is also undoubtably imminent.  The Supreme Court has held that "[a]n allegation of future injury may suffice" to satisfy the imminence requirements of the injury-in-fact prong of Article III standing "if the threatened injury is 'certainly impending,' *or* there is a 'substantial risk that the harm will occur.' "  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 414 n.5 (2013) (internal citations omitted) (internal quotation omitted)) (emphasis added).  While the Court cannot know with absolute certainty whether the primacy effect will in fact influence the results of the 2020 Minnesota General Election, the Court is persuaded that there is a very substantial risk that it will harm the DSCC and DCCC as a result of the Ballot Order statute for several reasons.

First, not only do the Plaintiffs offer undisputed expert evidence from Dr. Rodden that the primacy effect exists and has benefitted every major political party in Minnesota over the last 36 years (*see* Rodden Rpt. at 2, 5, 17–23), they have also offered undisputed expert evidence from Dr. Krosnick that the primacy effect "almost always" occurs for the

first-listed candidate *solely* as a result of their first-listed position.  (Krosnick Rpt. at 2 (emphasis added).)  Second, it is undisputed that because primacy effects have been found virtually everywhere that candidate name order effects have been studied, it is "extremely likely" to occur in Minnesota's 2020 General Election, including in its races for the U.S. House and U.S. Senate.  (*Id.*)  Finally, because DFL candidates will certainly be listed last among major political parties on Minnesota's 2020 General Election ballot pursuant to the Ballot Order statute, *see supra* § I(C), the primacy effect can only benefit DFL candidate's opponents.  Consequently, not only is there a substantial risk that the primacy effect will occur in Minnesota's 2020 General Election, the effect can only harm DFL candidates, and by extension, the DSCC and DCCC.  As a result, the Court finds that the DSCC and DCCC have made a "clear showing" of a concrete, particularized, imminent injury-in-fact.[13]

### b.      Traceability

The Court turns to the traceability requirement of standing.  As the Eighth Circuit has noted, "[a]n injury is 'fairly traceable' to a challenged statute when there is a 'causal connection' between the two."  *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560).  Moreover, the Eighth Circuit has "typically . . . considered an injury to be 'fairly traceable' where the 'named defendant[] . . . possess[es] the authority to enforce the complained-of provision.' "  *Id.*

---

[13]      The Eleventh Circuit's decision in *Jacobson* does not alter the analysis here because it expressly *declined* to address this form of injury.  957 F.3d at 1206 (declining to decide whether a political party has standing to challenge an electoral practice that harmed one of its candidate's electoral prospects in a particular election).

(quoting *Dig. Recognition Network, Inc. v. Hutchinson*, 03 F.3d 952, 958 (8th Cir. 2015) (internal quotation marks omitted)).

The Court finds that the DSCC and DCCC have sufficiently established that their injuries—diversion of resources and harm to electoral prospects—are fairly traceable to the Ballot Order statute and the Secretary.  As discussed above, the Ballot Order statute causes the primacy effect to benefit one political party over all others—notably, not the DFL—which in turn directly inflicts the injuries each committee contends it will imminently suffer: diversion of resources to counter the statute's effects, and harm to each committee's electoral prospects.  Moreover, the Secretary possesses the authority to enforce the statute.  Pursuant to Minn. Stat. § 204D.11, subd. 1, state general election ballots "shall be prepared by the county auditor *subject to the rules of the secretary of state*."  The Secretary is also responsible for "certify[ing] to the county auditors the order in which the names of the candidates representing the [major] political parties . . . must appear for every partisan office on the ballot."  Minn. R. 8250.1810, subp. 9.  Once that order is determined, the Secretary must "supply each auditor with a copy of an example ballot *to be used* at the state primary and state general election" that must "illustrate the form required for the ballots used in the primary and general elections *that year*."  Minn. Stat. § 204D.09, subd. 1 (emphasis added).  Importantly, "[t]he official ballot" used by the county auditors "must conform in all respects to the example ballot" provided by the Secretary.  *Id.*; *see also* Minn. R. 8250.1810, subp. 18 (same).  Indeed, the Secretary has

already created an example ballot for Minnesota's 2020 General Election[14] which lists the candidates in the order that each committee contends is causing them the injuries they seek to avoid. Accordingly, the DSCC's and DCCC's injuries—resource diversion and harm to electoral prospects—are fairly traceable to the Ballot Order statute and the Secretary.[15]

### c.      Redressability

Finally, the Court finds that the DSCC and DCCC have established redressability. To establish redressability, the DSCC and DCCC need to show that it is "likely" as opposed to "merely speculative" that their injury "will be redressed by a favorable decision." *City of Kennett v. Envtl. Protection Agency*, 887 F.3d 424, 432 (8th Cir. 2018) (citations omitted) (internal quotation marks omitted). Plaintiffs request that the Court declare the Ballot Order statute unconstitutional, enjoin the Secretary from implementing or enforcing the statute, and require the Secretary to implement a non-discriminatory system giving

---

[14]     *See* 2020 Example Ballot *supra* n.7.

[15]     HEP's assertions—and supplemental authority—regarding traceability are unavailing. First, HEP contends that neither organization gets "credit" for resources spent on races with a "third-party candidate" such a Legal Marijuana Now party candidate because such candidates (although the beneficiary of the primacy effect) have no chance of winning. (HEP Mem. at 8.) Even assuming that assertion (which is entirely speculative) is true, it ignores the undisputed contention that at least some races this fall will be competitive and require resources to be diverted into those races to counteract the primacy effect.

Second, the Court notes that HEP's supplemental authority, *Jacobson*, is distinguishable on traceability grounds. In *Jacobson*, the Eleventh Circuit concluded that any injury from Florida's ballot order statute was not traceable to or redressable by the Florida Secretary of State because Florida law gave the authority to print the names of candidates on the ballot to independent election supervisors, not the Secretary. 957 F.3d at 1207. Here, however, the order of the candidates on Minnesota's general election ballot is set by the Secretary of State pursuant to Minnesota law. *See supra* § II(A)(1)(b).

similarly-situated major political party candidates an equal opportunity to be first on the ballot. (Compl. at p. 19; Pls.' PI Mot. at 1–2.) If such relief is granted, the Ballot Order statute will no longer be in effect, and the benefits of the primacy effect will no longer be arbitrarily assigned to one political party's candidates based on political party affiliation. Indeed, the parties have stipulated that such relief is possible, and capable of being implemented, although they disagree on the precise method of implementation. (*See* Parties Joint Stip. re: Potential Relief at 1–2.) Accordingly, the Court finds that redressability has been satisfied here. If the statute here were declared unconstitutional, and an injunction granted, it "would ensure exactly the relief the [Plaintiffs] request. That is enough to satisfy Article III." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019) (citation omitted).

In sum, the Court finds that the DSCC and DCCC have established direct Article III standing under both a diversion of resources theory and harm to electoral prospects theory. Accordingly, because only one plaintiff need have standing for the Court to possess jurisdiction over the case, *see Dep't of Commerce*, 139 S. Ct. at 2565, the Court need not address whether the two organizations have associational standing, or whether the individual voter plaintiffs have standing.

### B.    Defendant's Motion to Dismiss

Defendant moves to dismiss Plaintiffs' complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) (*see* Def.'s Mot. to Dismiss [Doc. No. 13]), because "Plaintiffs' lawsuit finds no basis in law[.]" (Def.'s MTD Mem. at 4.) When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes the facts in the complaint to be

true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). In doing so, however, the Court is not required to defer to legal conclusions or "formulaic recitation[s] of the elements of a cause of action." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). While the plausibility standard is "not akin to a probability requirement," it necessarily requires a complaint to present "more than a sheer possibility that a defendant has acted unlawfully." *Id.* When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted).

### 1.    Count One – Undue Burden on Right to Vote

The Court first addresses whether Plaintiffs have stated a claim that the Ballot Order statute places an undue burden upon the right to vote in violation of the First and Fourteenth Amendments, under 42 U.S.C. § 1983, as set forth in Count One of their complaint.  (*See* Compl. ¶¶ 41–48.)  Plaintiffs bring their undue burden claim under 42 U.S.C. § 1983, which states that "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."  To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege that: (1) a right secured by the Constitution or laws of the United States was violated; and (2) the alleged violation was committed by a person acting under the color of state law."  *Minn. Voters Alliance v. Ritchie*, 890 F. Supp. 2d 1106, 1111 (D. Minn. 2012), *aff'd*, 720 F.3d 1029 (8th Cir. 2013).

Here, there is no serious dispute that Plaintiffs have plausibly alleged a violation of a right secured by the Constitution, and that the purported violation was committed by the Secretary acting under the color of state law.  The right to vote, as well as the right to associate for the purpose of promoting candidates that align with citizens' views, are recognized rights under the First and Fourteenth Amendments.  The Fourteenth Amendment undoubtably protects the right "to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  Indeed, "once the franchise [to vote] is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). Similarly, "[w]hile the freedom of association is not explicitly set out in the [First] Amendment," *Healy v. James*, 408 U.S. 169, 181 (1972), "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment . . . as an indispensable means of preserving other individual liberties," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). This right includes the ability "to associate . . . for the advancement of common political goals and ideas," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997), and "the ability of citizens to band together in promoting among the electorate candidates who espouse their political views," *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).

Plaintiffs allege that each of these rights—the right to vote and the right to associate to promote candidates who espouse their political views—are burdened by the Ballot Order statute because the statute arbitrarily assigns the benefits of the primacy effect to one political party's candidates based on party affiliation, which subsequently dilutes the votes for any non-first-listed candidate (including DFL candidates, who will be listed last on Minnesota's 2020 General Election ballot). (Compl. ¶¶ 44–45.) Such allegations are legally cognizable, having been recognized by courts within this circuit and elsewhere. *See McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) (holding ballot order statute that granted incumbents first-listed position on ballot "burdens the fundamental right to vote possessed by supporters of the last-listed candidates, in violation of the [F]ourteenth Amendment" and collecting cases); *see also Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1275 (N.D. Fla. 2019) (concluding that ballot order statute granting incumbents first-listed

advantage on ballot to be unconstitutional "thumb on the scale in favor of the party in power"), *vacated on other grounds*, 957 F.3d 1193 (vacating district court order for lack of standing); *Graves v. McElderry*, 946 F. Supp. 1569, 1578–79 (W.D. Okla. 1996) (concluding that Oklahoma statute giving incumbent first-listed position on ballot and accompanying positional advantage "infringes upon the careful and thoughtful voters' rights of free speech and association by negating the weight or impact of those citizen's votes for candidates for public office"); *Gould v. Grubb*, 536 P.2d 1337, 1343 (Cal. 1975) ("[A] statute, ordinance or election practice which reserves [a first-listed ballot position] advantage for a particular class of candidates inevitably dilutes the weight of the vote of all those electors who cast their ballots for a candidate who is not included within the favored class." (citation omitted)).

The Secretary argues that Plaintiffs' claims have no basis in law because while numerous courts have struck down incumbent-favoring ballot order statutes, Minnesota's Ballot Order statute does the opposite: it is "facially designed to make [the] level of single-party power over the levers of Minnesota's government *more difficult* [for incumbents] to maintain."   (Def.'s MTD Mem. at 4 (emphasis added); *Id.* at 10–14.)   "A state-law provision advantaging incumbents," the Secretary asserts, "is categorically different that a provision *dis*advantaging incumbents" because such "anti-incumbent" provisions function as a "check on [an incumbent party's political] power," while "incumbent-protection [statutes] . . . have the opposite effect . . . [of] insulat[ing] elected officials from the need to secure the consent of the governed . . . ."   (*Id.* at 12.)  Because the two types of statutes are "self-evidently not equivalent," and because Plaintiffs have purportedly cited "no

precedent (nor is the Secretary aware of any) holding that it is impermissible for states to promote political diversity and moderation by making re-election marginally harder for incumbents to obtain," the Secretary contends that dismissal as a matter of law is appropriate. (*Id.*) The Secretary also asserts that a more appropriate context in which to view the Ballot Order statute is by comparison to state-law provisions imposing term limits on individuals holding office in state governments because they place a burden on an incumbent candidates' ability to run for re-election. (*Id.* at 12–13.)

The Court finds the Secretary's arguments to be unavailing. While it is true that the cases cited by Plaintiffs appear to primarily involve incumbent-first statutes that granted positional advantages to the party in power, that does not mean that the legal principles discussed in those cases—or the resultant harms stemming from a state statute favoring one party's candidates over another—are not legally cognizable when applied to an allegedly "anti-incumbent" ballot order statute.[16]   None of the reasoning in those cases supports a finding that a statute that intentionally favors non-incumbents is valid; rather, those cases properly focus on the constitutional infirmity that results from the State putting its thumb on the scale at all.

---

[16]      The Court also notes that the Secretary's characterization of the statute as an "anti-incumbent" statute is misplaced.  The Ballot Order statute grants the benefits associated with the first-listed position on the ballot to whichever candidate is associated with the poorest-performing major political party in the last Minnesota general election.  Such an arrangement can actually boost an incumbent's chances depending on whether the poorest performing major political party offers a candidate for a given office.  For example, in the election for President of the United States this fall, if the Legal Marijuana Now party or the Grassroots-Legalize Cannabis party do not offer a candidate, the Republican candidate and *incumbent*, Donald J. Trump, will be given the benefits of the primacy effect by operation of the Ballot Order statute.

In fact, the "common thread" that runs through these cases is that "[c]ourts are deeply averse to state laws, regulations, and schemes that threaten political associations by favoring one association—or political party—over others." *Hand v. Scott*, 285 F. Supp. 3d 1289, 1296 (N.D. Fla. 2018), *vacated sub. nom. as moot*, *Hand v. Desantis*, 946 F.3d 1272 (11th Cir. 2020).  Where a statute "automatically elevates candidates to the top of the ballot based on their party affiliation," the harm at issue is the favoritism of *any* one party over another, regardless of whether it is the incumbent or not.  *Nelson v. Warner*, ___ F. Supp. 3d ___, 2020 WL 13112882, at *3 (S.D. W. Va. Mar. 17, 2020) (internal citations omitted) (internal quotation marks omitted).  Indeed, although "[t]he party benefitting from [Minnesota's Ballot Order statute] may shift over time, [] this does not mean the [s]tatute is nonpartisan" because it still elevates one party over others on the basis of party affiliation.  *Id.*  Even the Eighth Circuit's decision in *McLain*, which struck down a North Dakota ballot order statute favoring incumbents, rested on the state's admission that the statute was designed to serve one class of voters over another—state-sanctioned "favoritism" that burdened the fundamental right to vote possessed by supporters of the last-listed candidates.  637 F.2d at 1167.

The Secretary's comparison to term limits is equally inapposite.  Generally, a term limit imposes upon a *particular candidate* a broad bar to serve in a *particular office* where, for example, they have already served in that position for a certain number of years or terms.  *See, e.g.*, U.S. Const. amend. XXII, § 1 (imposing term limits on the office of the President of the United States).  In contrast, the Ballot Order statute does not bar any particular individual from running for office, much less specifically an incumbent party

candidate.  Rather, the statute's alleged harm to voting and associational rights is inflicted on *all* major party candidates, incumbent or otherwise, who do not benefit from the operation of the statute's plain terms (i.e., being listed first).  *See* Minn. Stat. § 204D.13, subd. 2.  Accordingly, the Court considers the Secretary's comparison to be inapt.

In sum, the Court finds that Plaintiffs have stated a plausible, legally cognizable claim that the Ballot Order statute inflicts an undue burden on the right to vote and the right to associate for the purpose of promoting candidates that align with citizens' views in violation of the First and Fourteenth Amendment.  As such, the Court denies the Secretary's Motion to Dismiss as to Count One.

### 2.    Count Two – Disparate Treatment

The Court next addresses whether Plaintiffs have stated a claim that the Ballot Order statute causes DFL-affiliated candidates to be treated differently than other similarly-situated major-political-party-affiliated candidates.  (*See* Compl. ¶¶ 49–53.)   Again, Plaintiffs' claim is brought under 42 U.S.C. § 1983, which requires them to allege that "(1) a right secured by the Constitution or laws of the United States was violated; and (2) the alleged violation was committed by a person acting under the color of state law." *Ritchie*, 890 F. Supp. 2d at 1111.

The Court finds that Plaintiffs have adequately alleged a claim for disparate treatment, and that such treatment occurred under the direction of the Secretary acting under color of state law.  The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection clause undoubtably protects the right "to participate in

elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336.

"[O]nce the franchise [to vote] is granted to the electorate, lines may not be drawn which

are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper*,

383 U.S. at 665.  Accordingly, although states may "as a practical matter, [engage in]

substantial regulation of elections" in order to ensure they remain "fair and honest," *Storer*,

415 U.S. at 730, such authority is "always subject to the limitation that [it] must not be

exercised in a way that violates other specific provisions of the Constitution." *Williams v.*

*Rhodes*, 393 U.S. 23, 29 (1968); *see also Sangmeister v. Woodard*, 565 F.2d 460, 465 (7th

Cir. 1977) ("It has become well established that the power of the state to regulate elections

must be exercised consistent with the dictates of the equal protection clause of the

Fourteenth Amendment." (citations omitted)).

Plaintiffs contend that the Ballot Order statute violates the Equal Protection clause

because it "treats one major political party—and its candidates, members, constituencies,

and the voters and organizations who support it—differently from the other major political

parties" based solely on the performance of that party's candidates in the last state general

election.  (Compl. ¶ 52.); *see also supra* § I(B)–(C) (discussing the Ballot Order statute, its

operation, and resulting outcome for Minnesota's General Election).   Other courts,

including the Eighth Circuit Court of Appeals, have recognized that such a claim is legally

cognizable.  *See McLain*, 637 F.2d at 1167 (noting that North Dakota statute giving

incumbents first-listed position on ballot "gives rise to [an] equal protection question

whether the inequality [the statute creates] offends the [F]ourteenth [A]mendment" and

holding that the provision ran afoul of the Equal Protection clause); *see also Netsch v.*

*Lewis*, 344 F. Supp. 1280, 1280–81 (N.D. Ill. 1972) (holding that state law granting "priority in listing on the election ballot by reason of incumbency and seniority" violated non-incumbent plaintiff's "right to equal protection pursuant to the Fourteenth Amendment"); *Mann v. Powell* ("*Mann I*"), 314 F. Supp. 677, 679 (N.D. Ill. 1969) (granting preliminary injunction barring incumbent-favoring tie breaking practices for ballot placement as a "purposeful and unlawful invasion of plaintiffs' Fourteenth Amendment right to fair and evenhanded treatment" and requiring either "drawing of candidates' names by lot or other nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballot"), *aff'd*, 398 U.S. 955 (1970).  Moreover, that the Ballot Order statute at issue here is not an "incumbent-first" statute does not alter the legal validity of Plaintiffs' claim.  *See supra* § II(B)(1).

The Secretary's primary argument against Plaintiffs' disparate treatment claim is that Plaintiffs are not similarly situated to the major political party that will be favored by operation of the Ballot Order statute—the Legal Marijuana Now party—because unlike that party, the DFL currently holds "every statewide office in Minnesota and therefore controls the vast majority of the levers of power in state government."  (Def.'s MTD Mem. at 14–15.)  It is "absurd," the Secretary contends, for Plaintiffs to assert that they "are being deprived of their electoral and associational rights" because the DFL holds most state offices in Minnesota, while the Legal Marijuana Now party to which they claim to be similarly situated "has never elected a single person to state office and has little to no political power whatsoever."  (*Id.* at 15.)

45

In response, Plaintiffs contend that the Secretary's position is wrong on both the law and the facts.  (Pls.' MTD Opp'n. Mem. at 16–17.)  They argue that it is Minnesota law—not Plaintiffs—that renders the Minnesota DFL, Legal Marijuana Now party, Grassroots-Legalize Cannabis party, and Minnesota Republican party similarly situated because Minnesota law defines each group as a "major political party."  (*Id.*); *see also* Minn. Stat. § 200.02, subd. 7(a)–(e) (setting forth state definition of "major" political party).  Moreover, the Plaintiffs note that the Ballot Order statute's ordering provisions apply only to "major political parties" as defined under state law, and that accordingly, the only parties to which they even could be considered "similarly situated" are other major political parties in the state.  *See* Minn. Stat. § 204D.13, subd. 2.  Finally, as to the facts, Plaintiffs contend that they are at least similarly situated to the Republican Party, which is the party that often benefits from the primacy effect anyway because the Legal Marijuana Now or Grassroots-Legalize Cannabis parties have historically run only a few candidates.  (Pls.' MTD Opp'n Mem. at 17.)

The Court finds the Secretary's argument to be unpersuasive.  While the Eighth Circuit has generally observed that to establish disparate treatment, plaintiffs must show they are " 'similarly situated in all *relevant* respects' " to another that did not suffer from the purported disparate treatment, *Carter v. Pulaski Cty. Special Sch. Dist.*, 956 F.2d 1055, 1058 (8th Cir. 2020) (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)) (emphasis added), it has not required that a plaintiff and potential comparator be identical in every respect.  Rather, the Eighth Circuit has described the test as requiring only that the comparator " 'possess[] all the *relevant* characteristics the plaintiff possesses

except for the characteristic about which the plaintiff alleges discrimination.' " *Mitchell v. Dakota Cty. Soc. Services*, ___ F.3d ___, 2020 WL 2529514, at *5 (8th Cir. 2020) (citation omitted) (emphasis added).

Here, the Ballot Order statute—the sole target of Plaintiffs' disparate treatment claim—applies to all political parties that fit the definition of "major political party" outlined by Minnesota law, regardless of the party's current representation in government, its size, base of support, or given chances for a successful election. *See* Minn. Stat. §§ 200.02, subd. 7(a)–(c); 204D.13, subd. 2. Indeed, the only relevant characteristic under the statute determining the statute's applicability is a party's qualification as a "major political party." Therefore, Minnesota's current four major political parties—the DFL, Minnesota Republican party, Legal Marijuana Now party, and Grassroots-Legalize Cannabis party— are similarly situated in all *relevant* respects, that is, each is a "major political party" rendering it subject to the statute's ordering requirements. It necessarily follows, then, that the Legal Marijuana Now party's candidates—who will be listed first on Minnesota's 2020 General Election ballot, *see supra* § I(C)—" 'possess[] all the *relevant* characteristics the plaintiff[s] possess[][,]' " namely, being a major political party under state law, " 'except for the characteristic about which the plaintiff alleges discrimination,' " *Mitchell*, 2020 WL 2529514, at *5 (citation omitted) (emphasis added), namely, association with the DFL as opposed to the Legal Marijuana Now party. Moreover, it is on this difference—party affiliation—that the Ballot Order statute automatically awards the benefits of the first-listed

position.[17]  Accordingly, the Secretary's argument that Plaintiffs are not similarly situated to the Legal Marijuana Now party fails.

In sum, the Court finds that Plaintiffs have stated a plausible, legally cognizable claim that the Ballot Order statute unconstitutionally treats one major political party's candidates differently from other similarly-situated major political party's candidates, including the Plaintiffs, in violation of the First and Fourteenth Amendment.  As such, the Court also denies the Secretary's Motion to Dismiss as to Count Two.

## C.      Plaintiffs' Motion for a Preliminary Injunction

The Court now turns to Plaintiffs' Motion for a Preliminary Injunction seeking to enjoin the Secretary from "implementing or enforcing Minn. Stat. § 204D.13(2)" and

---

[17]      It is worth addressing another of the Secretary's arguments at this juncture.  The Secretary contends that Plaintiffs' claimed remedy—rotation of all major political party candidate names so that the primacy effect is distributed evenly—would be unconstitutional because it does not take into account the fact that minor political parties and independent candidates would not be given an opportunity to obtain the primacy effects' benefits.  (Def.'s MTD Mem. at 16–17.)

However, this case involves only major political parties, a distinct group separate and apart from "minor political parties," which have their own definition under Minnesota law.  *See* Minn. Stat. §§ 200.02, subd. 23(a)–(e) (2018) (defining minor political party); 204D.13, subd. 3 (requiring non-major political party candidates to be listed after the names of major political party candidates in an order determined by lot).  Moreover, the Minnesota Supreme Court has upheld Minnesota's laws that require minor party and independent candidates to be listed after major party candidates as constitutional.  *See Ulland v. Growe*, 262 N.W.2d 412, 415 (Minn. 1978) (noting that "many statutes classify persons and provide for *unequal treatment as between the classifications*"), *cert. denied sub. nom.*, *Berg. v. Growe*, 436 U.S. 927 (1978).  Put simply, Plaintiffs' proposed remedy treats dissimilar entities—major and minor political parties—dissimilarly, which does not amount to disparate treatment.  *See United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995) ("[D]issimilar treatment of dissimilarly situated persons does not violate equal protection." (citation omitted) (internal quotation marks omitted)), *cert. denied*, 516 U.S. 886 (1995).

requiring him to "implement a non-discriminatory [] system that gives similarly-situated major-party candidates an equal opportunity to be placed first on the ballot."  (Pls.' Mot. for Prelim. Inj. [Doc. No. 22] at 1–2.)

When determining whether to grant a preliminary injunction, the Court weighs four familiar factors: "(1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between that harm and the harm that granting the injunction will inflict on the other parties; and (4) the public interest." *Virtual Radiologic Corp. v. Rabern*, No. 20-cv-0445, 2020 WL 1061465, at *1 (D. Minn. Mar. 5, 2020) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).  Because " '[a] preliminary injunction is an extraordinary remedy,' " the party seeking injunctive relief " 'bears the burden of proving' these factors weigh in its favor." *Mgmt. Registry, Inc. v. A.W. Co., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).  "The core question is whether the equities 'so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.' " *Am. Mortg. & Equity Consultants, Inc. v. Everett Fin., Inc.*, No. 20-cv-426 (ECT/KMM), 2020 WL 968534, at *3 (D. Minn. Feb. 28, 2020) (quoting *Dataphase*, 640 F.3d at 113 (footnote omitted)).  The decision to issue a preliminary injunction rests within the Court's discretion. *CDI Energy Servs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 401 (8th Cir. 2009).

Before a court can grant a preliminary injunction, the movant must establish "that it had 'no adequate remedy at law' because 'its injuries [could not] be fully compensated through an award of damages.' " *Id.* (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*,

563 F.3d 312, 319 (8th Cir. 2009)). While neither party appears to directly address this point, the Court is satisfied that Plaintiffs have no adequate remedy at law because neither the accrual of the benefits of the primacy effect to one political party, nor the potential loss of an election that can result, is compensable through an award of damages. *See Peer v. Lewis*, No. 06-60146-CIV, 2008 WL 2047978, at \*10 (S.D. Fla. May 13, 2008) (concluding that "as a matter of law, [] an individual cannot recover damages for a lost election" and collecting cases to that effect), *aff'd*, No. 08-13465, 2009 WL 323104 (11th Cir. Feb. 10, 2009). As such, the Court turns to the other preliminary injunction factors.

### 1. Threat of Irreparable Harm

The "threshold inquiry" when considering a motion for a preliminary injunction "is whether the movant has shown the threat of irreparable injury." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). Failure to show irreparable harm "is, by itself, a sufficient ground upon which to deny a preliminary injunction, [because] '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal citations omitted) (internal quotation marks omitted)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp.*, 563 F.3d at 319. The irreparable harm must be "likely in the absence of an injunction," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citations omitted), "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) (citation omitted). "Possible or speculative harm is not sufficient."

*Anytime Fitness, Inc. v. Family Fitness of Royal, LLC*, No. 09-cv-3503 (DSD/JSM), 2010 WL 145259, at *2 (D. Minn. Jan. 8, 2010).  Put another way, any irreparable harm must be actual and "immediate," as opposed to a "future risk[.]"  *Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation omitted) (internal quotation marks omitted).

Plaintiffs argue that they will suffer irreparable injury absent an injunction because (1) the benefits of the primacy effect stemming from the statute will hamper the DSCC and DCCC's commitment of resources to DFL candidates "up and down the ticket" in Minnesota, a loss of resources that cannot be remedied post-election; and (2) the Ballot Order statute systematically dilutes votes for DFL candidates by giving "voters who support the Legal Marijuana Now [p]arty, or, if it runs no candidate, the Grassroots-Legalize Cannabis [p]arty, or, if it runs no candidate, the Republican [p]arty, more voting power—another injury which no relief after the election can remedy."  (Pls.' PI Mem. at 24–25.)  Because such harms "strike at the very heart of the functioning of a fair and democratic society," Plaintiffs contend, they "cannot be remedied post-election" and are consequently irreparable.  (*Id.* at 26.)

In response, the Secretary argues that Plaintiffs have not demonstrated that there is a risk of any immediate injury because the election in question is several months away, during which time extensive legal proceedings could be conducted.  (Def.'s PI Opp'n Mem. at 7.)  Curiously, however, the Secretary also argues that Plaintiffs filed their request for injunctive relief too late, and accordingly, the force of Plaintiffs' allegations of irreparable harm are minimized.  (*Id.*)  The Secretary notes that despite the anticipated ballot order for

Minnesota's 2020 General Election being a matter of public record since November 2018, Plaintiffs did not file this suit until November 2019, and did not move for an injunction until February 2020, a delay that counsels against Plaintiffs' assertions of irreparable injury. (*Id.* at 7–8.) Finally, the Secretary argues that Plaintiffs have not attempted to show that they are at risk of irreparable harm if an injunction is not granted; rather, their harm arguments are directed at the harm they will allegedly suffer in the November election if they do not get the final relief they seek. (*Id.* at 8.) Such an argument, the Secretary contends, is an improper attempt to use a preliminary injunction motion to accelerate final resolution of the case. (*Id.*)

The Court finds that Plaintiffs have demonstrated a threat of irreparable harm, and accordingly, this factor weighs in their favor. First and foremost, the harm to Plaintiffs' constitutional rights under the First and Fourteenth Amendment are themselves routinely recognized as irreparable injuries for the purposes of a preliminary injunction motion. "The denial of a constitutional right is a cognizable injury . . . and an irreparable harm." *Portz v. St. Cloud Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) (citations omitted). Indeed, the Supreme Court has noted that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury." (citations omitted)) (collecting cases), *cert. denied*, 575 U.S. 950 (2015); *Marcus v. Iowa Public Television*, 97 F.3d 1137, 1140–41 (8th Cir. 1996) ("If [Plaintiffs' allegations that

their First Amendment rights have been violated] are correct . . . [such a violation] constitutes an irreparable harm." (citation omitted)). Similarly, "when the constitutional right is protected by the Fourteenth Amendment," such as Plaintiffs' equal protection claim here, "the denial of that right is an irreparable harm regardless of whether the plaintiff seeks redress under the Fourteenth Amendment itself or under a statute enacted via Congress's power to enforce the Fourteenth Amendment." *Portz*, 196 F. Supp. 3d at 973. And because the potential abridgment of Plaintiffs' constitutional rights stems from its effect on voting and associational rights in connection with an election, it is certainly irreparable in the sense that it cannot be adequately compensated post-election: "[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters [and, relevant here, political party committees] is real and completely irreparable if nothing is done to enjoin [the Ballot Order statute]." *League of Women Voters of N.C.*, 769 F.3d at 247.

The Secretary's argument that Plaintiffs' irreparable harm is not immediate is unavailing. That the 2020 General Election is months away does not undercut the undisputed evidence showing that absent an injunction, the harm is nearly certain to occur. *See supra* § I(D)(1)–(2). In fact, in light of that undisputed and unrefuted evidence, there is essentially no dispute that Plaintiffs' alleged harm is "likely in the absence of an injunction," *Winter*, 555 U.S. at 22 (citations omitted). Moreover, if the Plaintiffs are ultimately successful on the merits, there is no guarantee that this case will be resolved quickly enough to ensure that any relief the Court orders could be implemented in time for this fall's general election, particularly in light of the required timeline for preparing ballots. *See* Minn. R. 8250.1810, subp. 1 (2018) (requiring ballots to be prepared "no []

53

less than 46 days before an election unless otherwise specified in statute"); *see also Mann v. Powell* ("*Mann II*"), 333 F. Supp. 1261, 1267 (N.D. Ill. 1969) (finding irreparable harm based on verbal threat of discriminatory ballot action by state official based in part on the "difficulty of fashioning relief after ballots have been certified" (citation omitted)).  Thus, even though the election is several months away, the timelines surrounding the drafting and printing of Minnesota's general election ballots render the threat of irreparable harm "great[,] and of such imminence that there is a clear and present need for equitable relief[.]" *Iowa Utils. Bd.*, 109 F.3d at 425 (citation omitted).[18]

The Secretary's argument that Plaintiffs have waited too long to seek relief is also unpersuasive.  Certainly, a delay in bringing a motion for a preliminary injunction can undermine the strength of a party's request for injunctive relief.  *See Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) (noting that "delay alone may justify the denial of a preliminary injunction when the delay is inexplicable in light of a plaintiff's knowledge of the conduct of the defendant").  However, the Court is not persuaded that there was any meaningful delay in this case or that any such delay (to the extent it occurred at all) was unjustifiable or inexplicable.  Plaintiffs specifically seek to avoid harm that is "extremely likely" to occur in 2020 General Election.   (*See generally* Compl.)

---

[18]    The Secretary's contention that Plaintiffs' motion improperly seeks final relief—as opposed to preserving the status quo—is equally inapt.  In the context of a voting rights case where the harm sought to be avoided will occur in a *future* election, the status quo being maintained is the avoidance of the alleged constitutional violation.  *See, e.g.*, *Netsch*, 344 F. Supp. at 1280 (holding, in case seeking to enjoin future incumbent-first ballot priority practice, that "[t]he constitutional rights of the plaintiffs . . . will be irreparably damaged unless the *temporary order sought herein* is granted" (emphasis added)).

Accordingly, their suit (which necessarily was filed after the last general election, and one year before the 2020 General Election) is not, in the Court's view, untimely. *See Smith v. Clinton*, 687 F. Supp. 1310, 1313 (E.D. Ark. 1988) (noting that injury stemming for alleged unconstitutional apportionment plan was "suffered anew each time a[n] . . . election is held under the [allegedly unconstitutional plan]").

In sum, the Court finds that Plaintiffs have established the likely threat of irreparable harm to their First and Fourteenth Amendment rights stemming from the Ballot Order statute. Accordingly, this factor weighs in favor of granting a preliminary injunction.

## 2. Likelihood Of Success On The Merits

Beyond the threshold issue of irreparable harm, "the probability of success factor is the most significant" of the *Dataphase* factors. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). "[W]here a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute," as is the case here, "district courts [must] make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D.*, 530 F.3d at 732–33 (noting that "this more rigorous standard" is required to "ensure that preliminary injunctions that thwart a state's presumptively reasonable processes are pronounced only after an appropriately deferential analysis").

As an initial matter, the parties dispute the appropriate standard of review that the Court should apply in evaluating the constitutionality of the Ballot Order statute. The Secretary contends that rational basis review should apply, which requires the Court to uphold the statute so long as it bears a rational relation to a legitimate state interest. (Def.'s

MTD Mem. at 5–7.)  In support, the Secretary argues that numerous courts, including the Eighth Circuit, have held that because statutes affecting ballot order have an "attenuated" effect on the fundamental right to vote, a heightened standard of review is not necessary, and that rational basis review is appropriate.  (*Id.* at 5–6 (quoting *McLain*, 637 F.2d at 1167).

In response, Plaintiffs argue that because this is a state election law, the *Anderson/Burdick* test applies, which requires the Court to "weigh the 'character and magnitude' of the burden the State's rule imposes on [First and Fourteenth Amendment] rights against the interests the State contends justify the burden, and consider the extent to which the State's concerns make the burden necessary.' " *Timmons*, 520 U.S. at 358 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983))); (*see* Pls.' MTD Opp'n Mem. at 5–6 (citations omitted).)  While the Supreme Court has not provided any "litmus test" for measuring the severity of the burden that a state law imposes under the test, regardless how "slight [the state] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.' " *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).  Under this test, Plaintiffs assert, the burden on Plaintiffs' First and Fourteenth Amendment rights is "severe" and accordingly, they contend that heightened scrutiny should apply.  (Pls.' MTD Opp'n Mem. at 6.)  But in any event, Plaintiffs argue that even if rational basis review applies, favoritism of one or more political parties over others that are similarly situated—even to make it harder for an incumbent to stay in power—does not pass muster.  (*Id.* at 7.)

The Court finds that the *Anderson/Burdick* test applies here.  Plaintiffs' claims rest on purported violations of the First and Fourteenth Amendment associational rights stemming from the Ballot Order statute.  The Supreme Court has clearly stated that "[w]hen deciding whether a state election law violates First and Fourteenth Amendment associational rights," a court should "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify the burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358 (citations omitted) (internal quotation marks omitted).  There is no automatic " 'litmus-paper test' that will separate valid [state election laws] from invalid restrictions." *Anderson*, 460 U.S. at 789 (quoting *Storer*, 415 U.S. at 730).  To the contrary, in a constitutional challenge to a state election law, courts use the *Anderson/Burdick* test to determine the appropriate standard of review, and whether the challenged statute is constitutional under that standard, on a case-by-case basis.  *Timmons*, 520 U.S. 351 at 358 (applying *Anderson/Burdick* balancing test to evaluate appropriate standard of review for, and constitutionality of, state "fusion" candidacy statute); *see also Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 693 (8th Cir. 2011) (discussing *Anderson/Burdick* test).  Indeed, other courts have applied the test when addressing constitutional challenges to ballot order statutes.  *See, e.g.*, *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 714 (4th Cir. 2016) (applying *Anderson/Burdick* test to ballot order statute), *cert. denied sub nom.*, *Sarvis v. Alcorn*, 137 S. Ct. 1093 (2017); *Graves*, 946 F. Supp. at 1578 (same).[19]

---

[19]   While the Secretary is correct that the Eighth Circuit has observed that courts have applied rational basis review to ballot order statutes in the past, *see McLain*, 637 F.2d at

Accordingly, in evaluating whether Plaintiffs are likely to succeed on the merits, the Court applies the *Anderson/Burdick* test to the Ballot Order statute, and considers (1) the "character and magnitude" of the burden that the Ballot Order statute imposes on Plaintiffs' First and Fourteenth Amendment associational rights; (2) the state's asserted interests for any such burden (as well as the legitimacy and strength of each of those interests); and (3) whether the state's interests justify that burden, which also requires consideration of the extent to which the state's concerns make that burden necessary. *Jaeger*, 659 F.3d at 693–94 (citing *Anderson*, 460 U.S. at 789). "[T]he rigorousness of [the Court's] inquiry into the propriety of [the Ballot Order statute] depends upon the extent to which [the statute] burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. The more severe of a burden, the higher level of scrutiny the Court applies. *Id.* (citations omitted).

### a.   Character and Magnitude of Burden Imposed On Plaintiffs' Constitutional Rights

The Court first considers the character and magnitude of the burden imposed by the Ballot Order statute on Plaintiffs' constitutional rights. Plaintiffs argue that the statute imposes a "severe" burden on their First and Fourteenth Amendment rights because the statute constitutes state-sanctioned systematic favoritism of one major political party over

---

1167, that decision predates the Supreme Court's decisions in both *Anderson* and *Burdick*. The only post-*Anderson* case cited by the Secretary for the proposition that the Court should apply the rational basis test outright—*Graves v. McElderry*, 946 F. Supp. at 1581—in fact applied the *Anderson/Burdick* test to evaluate what standard of review was appropriate for a ballot order statute, and concluded that under that test, the ballot order statute at issue did not survive even rational basis review. *Id.* at 1578–82. The Eighth Circuit has since applied the *Anderson/Burdick* test to state election law challenges. *See Jaeger*, 659 F.3d at 693.

all others based solely on party affiliation.  (*See* Pls.' MTD Opp'n Mem. at 6; *see also* Pls.'
PI Mem. at 20 (noting that Minnesota's close elections make the burden imposed by the
Ballot Order statute even more severe).  In response, the Secretary contends that Eighth
Circuit precedent—specifically, *McLain*, 637 F.2d at 1167—makes clear that any burden
imposed by the statute is "attenuated" and accordingly subject to the lower, rational basis
standard of review.  (Def.'s PI Opp'n Mem. at 10.)

In evaluating the character and magnitude of the burden imposed by the Ballot Order
statute, the Court is well aware of the Supreme Court's admonition that "[i]t is beyond
cavil that 'voting is of the most fundamental significance under our constitutional
structure.' "  *Burdick*, 504 U.S. at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers
Party*, 440 U.S. 173, 184 (1979)).  Still, although voting is crucial to our democratic
system, "[i]t does not follow . . . that the right to vote in any manner and the right to
associate for political purposes through the ballot are absolute."  *Id.* (citation omitted).
Because the Constitution provides that States may set the "Times, Places and Manner of
holding Elections for Senators and Representatives," U.S. Const., art. I, § 4, cl. 1, the
Supreme Court has recognized that States retain the power to regulate their own elections.
*Burdick*, 504 U.S. at 433 (citing *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)).
"Common sense, as well as constitutional law, compels the conclusion that government
must play an active role in structuring elections" because " 'as a practical matter, there
must be a substantial regulation of elections if they are to be fair and honest and if some
sort of order, rather than chaos, is to accompany the democratic processes.' "  *Id.* (quoting
*Storer*, 415 U.S. at 730 (1974)).  Accordingly, "[e]lection laws will invariably impose *some*

burden" on voting and associational rights because every state election law, " 'inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.' " *Id.* (quoting *Anderson*, 460 U.S. at 788) (emphasis added).

Here, the character of the Ballot Order statute undoubtedly "has an effect on the fundamental right to vote . . . ." *McLain*, 637 F.2d at 1167. The statute categorically selects one "major political party" to be listed first on every general election ballot in Minnesota based entirely on their prior performance in the last state general election. *See* Minn. Stat. § 204D.13, subd. 2. While the party that benefits from this first-listed position may vary, such variation does not render the statute nonpartisan on its face. To the contrary, it simply means that "the direction of the statute's partisanship changes depending on the circumstances." *Jacobson*, 411 F. Supp. 3d at 1276. In fact, the Secretary admits that the purpose of the Ballot Order statute is to make it harder for the party in power to maintain power by giving poorer-performing major political parties a boost. (*See* Defs.' MTD Mem. at 4 ("The [Ballot Order] statute . . . is facially designed to make that level of single-party power over the levers of Minnesota's government more difficult to maintain."); *Id.* at 8 ("[T]he statutory formula explicitly favors new parties and out-parties at the (again, marginal) expense of the most popular party."); *Id.* at 9 (noting the statute "remind[s] members of the current in-party that their opponents will be, on balance, more likely to be able to turn them out of office in the next general election thanks to the small advantage conferred by the ballot-order statute.").)

Contrary to the Secretary's arguments, the advantage provided by the Ballot Order statute is not small. The unrefuted evidence shows that the primacy effect created by the

statute confers anywhere from 1% to 5.5% more votes on the party benefitting from the statute's operation.  *See supra* § I(D)(1).  Given that Minnesota's elections have, in the past, been decided by as slim of a margin as .01% of the vote share,[20] even a 1% increase in vote share as a result of the primacy effect created by the Ballot Order statute is significant.  And it is also undisputed that this significant advantage is all but certain to benefit Legal Marijuana Now party candidates in Minnesota's 2020 General Election solely as a result of their political affiliation with that party.  *See supra* § I(C).  As such, Plaintiffs have shown that the likely character of the burden imposed by the Ballot Order statute is "discriminatory because it awards the primacy effect vote to candidates based solely and uniquely on their political affiliation."  *Jacobson*, 411 F. Supp. 3d at 1276; *see also McLain*, 637 F.2d at 1167 (concluding that ballot order statute listing incumbents first constituted "favoritism" that "burden[ed] the fundamental right to vote possessed by supports of the last-listed candidates, in violation of the [F]ourteenth [A]mendment").

While the character of the Ballot Order statute places a discriminatory burden on the right to vote and freedom to political association, the magnitude of that burden is another question.  In *McLain*, the Eighth Circuit addressed a similar—albeit incumbent-favoring—ballot order statute.  637 F.2d at 1167.  In doing so, the court noted that while the statute certainly had an effect on the right to vote, the effect was, at best, "somewhat attenuated."  *Id.* (noting that most courts apply rational basis review to such "ballot format"

---

[20]      *See, e.g.*, *See 2008 General Election Results*, Minn. Secretary of State (last visited June 15, 2020), https://www.sos.state.mn.us/elections-voting/election-results/2008/2008-general-election-results/ (noting that in Minnesota's 2008 U.S. Senate race, Al Franken won over Norm Franken by 312 votes, or .01% of the total vote share).

statutes).  Other courts have similarly noted the lesser burden that ballot format statutes, like the one at issue, may impose on constitutional rights.  *See, e.g., Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447, 455–56 (D. N.J. 2012) ("[A] candidate's ballot placement can also be regulated [by the state], as placement is surely a less important aspect of voting rights than access [to the ballot]." (citations omitted)), *aff'd*, 700 F.3d 130, 130 (3d Cir. 2012) (noting the district court "correctly applied the [*Anderson/Burdick*] balancing test").  The Court acknowledges that the Ballot Order statute at issue here does not bar access to the ballot, nor does it prevent voting for, campaigning for, or otherwise showing support for a particular political party's candidates.  As one court noted, where "a restriction does not 'affect a political party's ability to perform its primary functions,' such as organizing, recruiting members, and choosing and promoting a candidate, the burden [on First Amendment rights] typically is not considered severe." *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 547 (6th Cir. 2014) (citation omitted).

Still, while the burden imposed by the Ballot Order statute may not be severe, the Court cannot ignore " 'the effect of the [statute] on the voters, the parties and the candidates' and 'evidence of the real impact the restriction has on the political process.' " *Id.* (citation omitted).  Indeed, the Supreme Court has cautioned that courts applying the *Anderson/Burdick* test should conduct a "realistic appraisal" of the statute at issue. *Anderson*, 460 U.S. at 806.  Doing so necessarily requires consideration of the practical burden the Ballot Order statute imposes on the Plaintiffs' constitutional rights. *Jacobson*, 411 F. Supp. 3d at 1281.  While the "[s]everity" of a statute's effects on Plaintiffs'

constitutional rights "is an objective question," the "realistic context" surrounding the statute's operation "is important to the [Court's] analysis." *Id.* at 1281 n.27.

When the practical burden of the statute is considered, the undisputed evidence shows that the Ballot Order statute is "not a neutral, nondiscriminatory restriction on Plaintiffs' voting [and associational] rights, and the burden it imposes is significant" considering the contextually-large windfall provided by the primacy effect. *Id.* at 1282. Indeed, even a 1% increase in vote share—which, under the Ballot Order statute, is arbitrarily awarded to one political party's candidates based solely on party affiliation— could be "decisive" in a Minnesota general election. *Id.* at 1281. Thus, even though the Ballot Order statute may have only an "attenuated effect" on Plaintiffs' constitutional rights when considered in a vacuum, *McLain*, 637 F.2d at 1167, any "realistic appraisal" of the statute, *Anderson*, 406 U.S. at 806, indicates that it is likely that the practical burden that the Ballot Order statute places on Plaintiffs constitutional rights goes beyond the minimal burden normally associated with rational basis review. *See Jacobson*, 411 F. Supp. 3d at 1282 (applying heightened scrutiny to similar ballot order statute after concluding burden on Plaintiffs' constitutional rights was "significant in both the statistical sense and in qualitative terms").

### b.      Minnesota's Asserted State Interests

Having discussed the character and magnitude of the burden imposed on the Plaintiffs' constitutional rights by the Ballot Order statute, the Court now turns to Minnesota's asserted state interests underlying the statute, and consideration of the legitimacy and strength of each of those interests. *Jaeger*, 659 F.3d at 693–94 (citing

*Anderson*, 460 U.S. at 789).  According to the Secretary, the Ballot Order statute is justified by three state interests:  (1) encouraging political diversity; (2) countering the "incumbent" effect; and (3) discouraging sustained single-party rule.  (Def.'s PI Opp'n Mem. at 10.) Plaintiffs, in response, contend that Minnesota has no legitimate interest in tipping the scale in favor of *any* party, regardless of its interest in political diversity or countering the incumbent effect, because the "Constitution plainly prohibits any such interference."  (Pls.' PI Mem. at 23.)  The Court considers each purported state interest in turn.

With respect to the promotion of political diversity and discouraging single-party rule, the Supreme Court has criticized statutes that "limit[] the opportunities of independent-minded voters to associate in the electoral arena" because such restrictions "threaten to reduce diversity and competition in the marketplace of ideas."  *Anderson*, 460 U.S. at 794.  Moreover, the Supreme Court has observed that, historically, "political figures outside the two major parties have been fertile sources of new ideas and new programs" and that "many of their challenges to the status quo have in time made their way into the political mainstream."  *Id.* (citing *Ill. Bd. of Elections*, 440 U.S. at 186).  And the Court has noted that "the primary values protected by the First Amendment—'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,'—are served when election campaigns are not monopolized by the existing political parties."  *Id.* (citation omitted).

However, even though political diversity and the desire to discourage single-party rule are laudable goals, the law does not permit a statute that explicitly favors some political parties at the expense of other political parties.  Certainly, a state may have a legitimate

interest in removing obstacles to allow a small political party to earn a position on the ballot. *Rhodes*, 393 U.S. at 31 (noting that Ohio laws that made it substantially more difficult for new parties to gain access to the election ballot placed "substantially unequal burden[]" on both the right to vote and the right to associate). Doing so does nothing more than allow new political ideas to be considered by the people in an election—on an equal playing field.

But the law is equally clear that such an interest does not extend to a state engaging in political favoritism to give an advantage *in an election* to a smaller party in order to promote political diversity. "The Fourteenth Amendment requires all candidates, newcomers and incumbents alike, to be treated equally" by the state. *Mann II*, 333 F. Supp. at 1267. Favoring one political party's candidates—even a small political party whose new ideas may increase political diversity—by giving them an advantage in an election does the opposite; it is a form of political patronage, which "is not a legitimate state interest which may be served by a state's decision to classify or discriminate in the manner in which election ballots are configured as to the position of candidates on the ballot." *Graves*, 946 F. Supp. at 1581 (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69–70 (1990)). Put another way, the Constitution does not allow a state to "put its thumb on the scale" of an election and "award an electoral advantage" to *any* party, irrespective of whether the party is in power or new to the political arena. *Jacobson*, 411 F. Supp. 3d at 1255; *see also Hand*, 285 F. Supp. 3d at 1297 ("The [Supreme] Court, in short, has repeatedly recoiled from anything that resembles a thumb on the scales of association and, by extension, the democratic process."). Here, at its core, the Secretary's asserted goal in promoting political

diversity is in reality an interest in giving an electoral advantage—in the form of more votes—to smaller major political parties at the expense of established major political parties.  Such an interest cannot be legitimate because it constitutes state-based political favoritism.  *McLain*, 637 F.2d at 1167.

The same is true of any interest in combating a purported "incumbent" effect, which the Secretary primarily describes as an interest in "reducing the power of incumbency . . . ."  (Def.'s PI Opp'n Mem. at 11.)  And while states may wish to expand ballot access to new political parties—which may force incumbents to adapt to new ideas and political trends—the state cannot avoid the fact that the interest it seeks to vindicate here is a desire to give an electoral advantage to smaller major political parties at the expense of established major political parties.  Such an interest is not legitimate because, as noted above, it constitutes a form of political patronage and state-based favoritism.  *See Graves*, 946 F. Supp. at 1581; *see also McLain*, 637 F.2d at 1167.

In sum, the Court finds that Plaintiffs have shown a likelihood that Minnesota's asserted interests in the Ballot Order statute are not legitimate.

### c. Likelihood That Minnesota's Interests in the Ballot Order Statute Justify the Burden The Statute Imposes on Plaintiffs' Constitutional Rights

Finally, the Court considers whether the state's alleged interests in the Ballot Order statute justify the burden it imposes on Plaintiffs' constitutional rights.  *Jaeger*, 659 F.3d at 693–94 (citing *Anderson*, 460 U.S. at 789).  The Court need not engage in a substantial discussion of this point because, as noted above, the Court finds that the Plaintiffs have proven that it is likely that Minnesota's purported interests in the Ballot Order statute—the

promotion of political diversity, discouraging single-party rule, and counteracting an "incumbency" effect—are not legitimate. *See supra* § II(C)(2)(b). Accordingly, Plaintiffs have shown that it is likely that the Ballot Order statute "cannot survive even [the] lowest level of scrutiny, the rational basis test, because the State has failed to articulate *any* legitimate interest to be served by [the statute]." *Graves*, 946 F. Supp. at 1581 (emphasis added); *see also Jacobson*, 411 F. Supp. 3d at 1282 ("[E]ven under the rational-basis standard, [the state] has not advanced relevant, legitimate interests which the [Minnesota] Legislature could rationally conclude justify burdening Plaintiffs' rights as [Minnesota's] current ballot order scheme does.").

### 3.   Balance Of Harms and Public Interest

Finally, the Court turns the last two factors of the preliminary injunction analysis—the balance of the harms, and the public interest. *See Virtual Radiologic Corp.*, 2020 WL 1061465, at *1 (citing *Dataphase Sys., Inc.*, 640 F.2d at 114). Balancing the harms involves assessing the harm the movant would suffer absent an injunction, as well as the harm other interested parties would experience if the injunction issued. *Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, ___ F. Supp. 3d ___, 2020 WL 1812501, at *26 (D. Minn. 2020) (citing *Am. Mortg & Equity Consultants, Inc.*, 2020 WL 968354, at *6). It requires the Court to " 'flexibly weigh the case's particular circumstances to determine whether . . . justice requires the court to intervene to preserve the status quo.' " *Wood v. Kapustin*, No. 13-cv-1495 (DSD/AJB), 2013 WL 3833981, at *4 (D. Minn. July 23, 2013) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)). The public interest factor, on the other hand, requires the Court to

consider the interest of the public when deciding whether a preliminary injunction should

issue.   *Mainstream Fashions Franchising, Inc.*, 2020 WL 1812501, at *27 (citing

*Dataphase Sys., Inc.*, 640 F.2d at 114).

The Court finds that both factors weigh in favor of the Plaintiffs.  With respect to

the public interest, the Eighth Circuit has observed that "the determination of where the

public interest lies also is dependent on the determination of the likelihood of success on

the merits of the [constitutional] challenge because it is always in the public interest to

protect constitutional rights."  *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008),

*overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir.

2012) (en banc); *see also Rogers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (noting that

after a finding that a state law is likely unconstitutional has been made, the "remote chance"

that a state may later prove the law constitutional "cannot be held sufficient to overcome

the public's interest in protecting freedom of expression" (citation omitted)).  Having found

that Plaintiffs are likely to prevail on the merits, and that the Ballot Order statute is likely

unconstitutional, the Court finds that it is in the public interest to protect Plaintiffs'

constitutional rights.[21]

---

[21]    The Secretary argues that the public interest favors him because (1) a proposed bill currently before the Minnesota Legislature would resolve the Ballot Order statute's purported constitutional problem; (2) Plaintiffs waited too long to bring their case; and (3) an injunction would require the state to spend millions of dollars to buy new voting machines capable of remedying the Ballot Order statute's deficiencies, a cost that the state could not recover if it wins on the merits. (Def.'s PI Opp'n Mem. at 17–18.)  As noted above, however, the Court does not consider any delay by Plaintiffs to be particularly onerous, *see supra* § II(C)(1).  Moreover, a pending bill is not law, and does not diminish Plaintiffs' interest in avoiding harm to their constitutional rights.  *See Navarro v. United States*, No. 13-6424 (RMB), 2014 WL 6895591, at *2 n.1 (D. N.J. Dec. 5, 2014) (declining

The balance of the harms also favors Plaintiffs.  Absent an injunction, Plaintiffs are likely to suffer irreparable harm because the Ballot Order statute forces them to compete and vote on an uneven playing field.  *See Graves*, 946 F. Supp. at 1579 (noting that position bias created by a state statute in an election "infringes upon the careful and thoughtful voters' rights of free speech and association by negating the weight or impact of those citizens' votes for candidates for public office").  Minnesota, on the other hand, does not suffer at all because a "State has no interest in enforcing laws that are unconstitutional . . . [and] an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State."  *Little Rock Family Planning Services v. Rutledge*, 397 F. Supp. 3d 1213, 1322 (E.D. Ark. 2019) (citing H*ispanic Interest Coal. Of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012)).  This is particularly true given that the injunctive relief granted at this preliminary stage, discussed *infra* § II(C)(4), will not require Minnesota to purchase new voting equipment, which might otherwise be a significant expense.

In summary, Plaintiffs have shown a threat of irreparable harm and a likelihood of success on the merits with respect to their claims that the Ballot Order statute infringes upon their First and Fourteenth Amendment rights.  Moreover, Plaintiffs have also shown that the balance of the harms and the public interest favors a preliminary injunction barring

---

to consider compliance with proposed bill because it was "*not* law").  And, as the Court discusses below, the injunctive relief being granted at this preliminary stage will not require Minnesota to spend millions of dollars on new voting equipment.  *See infra* § II(C)(4).

enforcement of the statute, and the implementation of a nondiscriminatory ballot ordering system under which the State does not discriminate on the basis of party affiliation.

### 4.      Appropriate Remedy

Having concluded that a preliminary injunction is appropriate, the Court now considers what form the injunction should take.  The purpose of preliminary injunctive relief is to preserve the status quo and prevent the identified irreparable harm until the merits of the dispute can be resolved.  *Miller v. Thurston*, No. 5:20-cv-05070, 2020 WL 2617312, at *10 (W.D. Ark. May 25, 2020).  Accordingly, "a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."  *Devose v. Herrington*, 42 F.3d 470, 470 (8th Cir. 1994) (citation omitted).  The injunction itself should be narrowly tailored to remedy only the specific harms shown by the plaintiffs.  *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022–23 (8th Cir. 2015) (citing *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (per curiam)).  Because issuing a preliminary injunction is an exercise of discretion, the Court need not act mechanically, but can choose from a range of potentially permissible options, *Novus Franchising, Inc.*, 725 F.3d at 895– 96 (8th Cir. 2013), keeping in mind its obligation to "mould each decree to the necessities of the particular case" while giving "particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citations omitted) (internal quotation marks omitted).

At the direction of the Court, the parties submitted a stipulation detailing options that the State could take to implement a non-discriminatory system that gives similarly-

situated major political party candidates an equal opportunity to be first on the ballot.  (*See* Parties Joint Stip. re: Potential Relief.)   The parties agree on two possible options: (1) requiring the Secretary to rotate *all candidates* in each partisan race—not just major-party candidates[22]—on a "precinct-by-precinct basis so that each of the candidates appears in the first ballot position an approximately equal number of times as the other candidates in the same race"; or (2) requiring the Secretary to implement a lottery procedure whereby Minnesota's four current major parties are "assigned, by lot, a single statewide ballot order that would govern the appearance of the parties' candidates in every partisan race in the November general election."  (*Id.* at 1–2.)  Plaintiffs prefer option one—rotation of all candidates' names—because it eliminates the primacy effect, as opposed to the lottery approach, which just randomly assigns the benefits of the primacy effect to one party.  (*Id.* at 3.)  The Secretary, on the other hand, prefers the lottery option because while the rotation option is technically feasible, it could result in an untested rotation algorithm being used in Minnesota's 2020 General Election.  (*Id.* at 4–5.)

After carefully considering the two options, the Court finds that option two—the lottery approach—is more appropriate, at least as preliminary relief.  The Court is mindful that a "preliminary injunction that requires the State to depart too drastically from its present framework . . . might tip the balance of the harms so much that the purpose of the preliminary injunctive relief is frustrated."  *Miller*, 2020 WL 2617312, at *9.  Accordingly, where a preliminary injunction will "upend a framework democratically enacted by the

---

[22]     Notably, software limitations on current voting equipment appear to prevent rotation of only major political party candidates.  (*See* Parties Joint Stip. Re: Potential Relief at 5.)

people," the Court "must strive to preliminary enjoin only those requirements that Plaintiffs have shown are likely unconstitutional, rather than use the injunctive process to impose a framework that appears preferable." *Id.* Here, the harm inflicted by the Ballot Order statute is one of political favoritism: Minnesota arbitrarily assigns an electoral boost to the poorest-performing major political party's candidates based solely on party affiliation to the detriment of all other major political party candidates on the ballot. Accordingly, requiring the Secretary to use a system where the first-listed major political party candidate is selected randomly completely avoids the irreparable harm at issue—state-based favoritism—by randomizing which party benefits from the primacy effect.

Additionally, the lottery approach is the better option at this preliminary stage because candidate order by random assignment "can be put into effect by the computer hardware and software that [already] administers Minnesota's elections without any fear of error." (Parties Joint Stip. Re: Potential Relief at 5.) By contrast, requiring a rotation framework "might tip the balance of the harms so much that the purpose of the preliminary injunctive relief is frustrated." *Miller*, 2020 WL 2617312, at *9. As the Secretary notes, while an "all candidate rotation system" for partisan offices on Minnesota's 2020 General Election ballot *may* be possible using Minnesota's current voting systems, "neither the Secretary nor county election officials . . . have had an opportunity to test a rotation algorithm to verify that it can accurately and efficiently administer a statewide general election." (Parties Joint Stip. Re: Potential Relief at 5.) And, the Secretary contends, there

will not be enough time to conduct such testing between now and August, the date by which a finished algorithm must be put to use.[23]  (*Id.*)

Finally, requiring a rotation-based system would likely trigger the Secretary's legal obligation to recertify counties' tabulation machines and software, a process that "takes several months" and cannot be completed before the mid-August 2020 deadline necessary for Minnesota's 2020 General Election.  (*Id.* at 8); *see also* Minn. Stat. §§ 206.57, subd. 1 (2018) ("A voting system not approved by the secretary of state may not be used at an election in this state."); 206.58, subd. 1 (2018) (requiring any electronic voting system to be approved by the Secretary prior to use).  The Court declines—at this preliminary stage— to require the Secretary to implement a process that, given the limited time before Minnesota's 2020 General Election, impedes his ability to meet his legal obligations to the citizens of Minnesota, or undermines the State's valid interest in ensuring the integrity of its elections.  *See Crawford*, 553 U.S. at 197 (acknowledging valid state interest in "protecting public confidence 'in the integrity and legitimacy of representative government' " (citation omitted)).

---

[23]    The Court also notes that the rotation of all candidates for partisan office would necessarily impact the interests of independent and minor political party candidates who, as the Court noted above, are not similarly situated to major political party candidates for the purposes of Plaintiffs' equal protection claim.  *See supra* § II(B)(2).

## III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Steve Simon's Motion to Dismiss (Doc. No. 13) is **DENIED**, and Plaintiffs Madeline Pavek, Ethan Sykes, DSCC, and DCCC's Motion for a Preliminary Injunction (Doc. No. 22) is **GRANTED** as follows:

1.    Defendant Secretary Steve Simon, his successors in office, deputies, officers, employees, agents, or any other person in active participation or concert with the Secretary shall not enforce, nor permit enforcement of, the ballot order provision described in Minn. Stat. § 204D.13, subd. 2, from the date of this Order, until further modified by order of this Court.  No bond is required.

2.    Defendant Secretary Steve Simon is hereby ordered to adopt a procedure under which Minnesota's four current major political parties are assigned, by lot, a single statewide ballot order that governs the appearance of the parties' candidates in every partisan race in Minnesota's 2020 General Election.

**IT IS SO ORDERED.**

Dated: June 15, 2020                              s/Susan Richard Nelson
                                                  Susan Richard Nelson
                                                  United States District Judge

74